DIOCESE OF WINONA, a Minnesota non-profit religious corporation,
Plaintiff,

v.

INTERSTATE FIRE & CASUALTY COMPANY; those certain underwriters at Lloyd's, London, signatory to Policies Nos. SL3402 and SLC5421; and Centennial Insurance Company, Defendants.

ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS; the Church of the Immaculate Conception in Columbia Heights, Minnesota; and the Church of the Risen Savior in Apple Valley, Minnesota, Plaintiffs,

v.

UNDERWRITERS AT LLOYD'S, LONDON; Interstate Fire and Casualty Company; and Aetna Casualty and Surety Company, Defendants.

Civil Nos. 3–90–441, 3–90–527.

United States District Court,
D. Minnesota.
Third Division.

June 20, 1994.

MAGNUSON, Judge.

In these consolidated declaratory judgment actions, the Archdiocese of Saint Paul and Minneapolis, two churches within the Archdiocese, and the Diocese of Winona (collectively, "the churches") seek a declaration concerning the existence and extent of insurance coverage under policies issued by Underwriters at Lloyd's, London; Interstate Fire and Casualty Company; and Aetna Casualty and Surety Company. Both actions arise out of an underlying lawsuit in which the jury found for Thomas Mrozka and against the churches on his claims of pedophilic sexual abuse by Father Thomas Adamson, a priest employed by the churches.

In 1992, all parties moved for summary judgment. The court granted the motions by Lloyd's and Interstate seeking a declaration that the insurance policies did not cover punitive damages. *See Diocese of Winona v. Interstate Fire and Casualty Co.,* 841 F.Supp. 894 (D.Minn.1992). The court, however, denied all of the other motions at that time. The matter is now before the court for trial. The court must now decide what portion of Mrozka's compensatory judgment each of the five parties is responsible for (the court, like the parties, will treat the Archdiocese, the Church of the Immaculate Conception, and the Church of the Risen Savior as one party).

## I. Background

### A. The Churches' Knowledge of Adamson's Pedophilia

The Diocese of Winona employed Adamson as a priest from 1958 to 1985. From 1958 to 1974, he served in various school and parish assignments in the Diocese of Winona. In January 1975, Adamson was transferred to the Archdiocese of Saint Paul and Minneapolis, where he served in various positions until January 1985.

In the twenty years between 1964 and 1984, either the Diocese, the Archdiocese, or both learned of six confirmed sexually inappropriate contacts or relationships between Adamson and boys. During this period, the churches also received unconfirmed reports of at least two additional incidents of inappropriate sexual conduct between Adamson and boys. Finally, between 1980 and 1984 the Archdiocese also received reports of unusual contacts between Adamson and boys, including Mrozka.

After the first confirmed incident, the Diocese merely reprimanded Adamson and transferred him to another community. After each of the next four confirmed incidents, however, Adamson went through counseling at the churches' behest. Finally, after the sixth confirmed inappropriate incident or relationship, the churches relieved Adamson of his duties as a priest.

The Diocese first learned of sexual misconduct by Adamson in the spring of 1964, when Adamson admitted to having sexually touched a male eighth grade student at a school in Caledonia. Bishop Edward Fitzgerald, who served as Bishop of the Diocese of Winona from Adamson's ordination until 1969, expressed his shock to Adamson, made Adamson promise never to do it again, and transferred him to Rochester Lourdes high school as an assistant principal.

The second confirmed incident occurred in 1966 or 1967. Monsignor Raymond Jansen learned that Adamson had inappropriately asked boys to undress in front of him at Rochester Lourdes. When Jansen confronted him, Adamson admitted the conduct. At Monsignor Jansen's suggestion, Adamson then received three months of counseling from Dr. Francis Tyce. Following the counseling from Tyce, Adamson was again transferred, although there is no evidence linking the transfer to the undressing incident. There also is no evidence that Monsignor

Jansen informed Bishop Fitzgerald of the incident.

In early 1974, the Diocese learned of a third confirmed instance of Adamson's sexual misconduct. After being confronted by Bishop Loras Watters, Fitzgerald's successor, Adamson admitted to having touched a fourteen-year-old boy in a pool or sauna. As a result, Adamson received out-patient psychotherapy from Dr. Tyce and from Father Kenneth Pierre from April to June 1974. Adamson then received in-patient therapy at the Institute of Living in Hartford, Connecticut from early June to early August 1974. At the Institute of Living, Dr. John Curran supervised Adamson. Dr. Curran diagnosed Adamson as a homosexual with a "sexual orientation disturbance." At discharge, Curran listed Adamson's condition as only "slightly improved," but stated "he has every chance to overcome his problem." Curran recommended that Adamson "continue in his position, and at the same time seek psychotherapy with his bishop's approval."

Upon his discharge from the Institute of Living, Adamson returned to his pastoral duties in Rochester and continued out-patient psychotherapy with Father Pierre. Later that fall, Bishop Watters heard a rumor that a social worker was concerned about contacts between Adamson and a teenage boy. The Diocese did not act on the rumor.

The Diocese became aware of a fourth incident of misconduct by Adamson in December 1974. A former parishioner of Adamson's informed Bishop Watters that Adamson had sexually abused his brother as a boy in the 1960s. He demanded that Watters remove Adamson from his position and threatened to reveal Adamson's past sexual history to his congregation. Watters initially refused to accede to the demand. When a colleague of Bishop Watters' met with Watters about the demand that Adamson be removed, he told her "Father Adamson is one of my finest men. He has received the finest treatment and he has admitted that he still cannot control himself." Eventually, however, Bishop Watters relented and removed Adamson in order to avoid public disclosure and scandal.

Adamson moved to Minneapolis to continue out-patient therapy with Father Pierre and to continue graduate course work at the University of Minnesota. In order to accommodate Adamson's treatment and schooling in the Twin Cities, Bishop Watters asked Archbishop Roach of the Archdiocese of Saint Paul and Minneapolis to allow Adamson to stay in residence at the Archdiocese.

Watters told Roach that Adamson was in treatment with Pierre and that he was "a victim of a situation in Winona" due to homosexual relations with an adult. Watters did not, however, inform Roach of Adamson's pedophilia, and Roach apparently did not learn of it until late 1980.

In April 1975, Father Pierre wrote to Bishop Watters, advising him that Adamson had made progress in treatment and was ready for reassignment within the Diocese. Pierre also wrote "it is unlikely that he will regress to this behavior in the foreseeable future." Bishop Watters, however, refused to reassign Adamson, citing a growing awareness in the Diocese of Adamson's pedophilia.

Later that year, in October, Father Pierre again wrote Watters, reiterating Adamson's progress in treatment and his readiness for reassignment as a priest. Despite this recommendation, both Watters and the Priest Personnel Board continued to oppose an assignment for Adamson within the Diocese. The minutes of the October 15, 1975 Priest Personnel Board meeting state that "Although Father Adamson may be completely recovered or in complete control, the people of the Diocese must also be considered. When they are considered, delay is dictated."

Adamson discontinued his counseling with Father Pierre in January 1976, and received no further treatment until 1980. In the summer of 1976, at Bishop Watters' request, Archbishop Roach assigned Adamson to an associate pastor position at Saint Thomas Aquinas parish in Saint Paul Park. After three apparently successful years at Saint Thomas Aquinas, Roach appointed Adamson to head the Immaculate Conception parish in Columbia Heights. Adamson's abuse of Mrozka began shortly after his arrival at Immaculate Conception in June 1979.

The fifth report of pedophilia came to the churches' attention in November 1980. Father Joseph Wajda learned that Adamson had inappropriately touched a boy at Immaculate Conception and reported this to Archdiocese Chancellor Robert Carlson. Chancellor (later Bishop) Carlson, in turn, relayed the information to Roach.

Roach asked Carlson and Wajda to investigate Adamson's activities. During the course of this investigation, Wajda reported to Carlson "There are a number of other things—Taking a young boy by the name of Tom Maruska (sic) for overnights in Rochester. A kind of world that centers on young boys and some late night going out and having visitors in." In a later memo, Father Wajda noted that a teacher at Immaculate Conception reported a number of contacts between Adamson and Mrozka and his family. Chancellor Carlson received a report from Sister Patrice Neuberger that three eighth grade boys had told her Adamson was gay. Carlson noted that Sister Neuberger "feels that Father Adamson was also involved with the Maruska (sic) boys." Finally, Chancellor Carlson met with Father Pierre. Pierre was willing to see Adamson again, but doubted "that there would be any effective change unless Father Adamson could bring himself to deciding that inpatient treatment was in his best interests. Apparently, they challenged him pretty hard last time, and he found it very painful." Father Pierre also indicated "there have been other incidents of this nature."

In his final report to Archbishop Roach, Carlson stated "I don't think we are dealing with an isolated instance, but I can't prove that. There are some details I have decided not to put in writing, and I would be happy to discuss them with you in person." Carlson recommended three options: 1) returning Adamson to the Diocese of Winona; 2) placing Adamson in inpatient treatment; and 3) "accept Father Adamson and the orientation he has," insist that he see Pierre regularly, and transfer him from Immaculate Conception. Handwritten at the bottom of the report is the notation "inpatient therapy."

Adamson resigned from Immaculate Conception and entered inpatient treatment at Saint Mary's Hospital in Minneapolis. Adamson remained there for three weeks under the care of Dr. Joseph Gendron, a psychiatrist with experience treating priests with sexuality problems. Upon discharge, Dr. Gendron informed Chancellor Carlson that Adamson could return to his pastoral duties provided he continued out-patient psychotherapy and had no contact with youth.

In February 1981, Archbishop Roach assigned Adamson to the Church of the Risen Savior in Apple Valley as an associate pastor. Roach orally made a condition of this assignment that, without permission, Adamson was to have no contact with youth, was not to return to Anoka county, home of the Immaculate Conception parish, and was not to communicate with anyone at Immaculate Conception. Any breach of these conditions would dictate his "immediate return to Winona." Adamson was to be under the supervision of Father Michael Korf.

Archbishop Roach decided on this assignment after weighing Chancellor Carlson's opposition to the assignment against Dr. Gendron's recommendation that Adamson was ready for pastoral work with regular monitoring. Adamson continued to see Dr. Gendron regularly as an out patient until August 1981. After that date, Adamson saw Gendron only sporadically.

In a June 18, 1981 memo, Father Korf noted that a report that, in apparent violation of the conditions he had agreed to, Adamson was in contact with the "Maruska" family at Immaculate Conception, and that he had played golf with "Tom and his mother." There is no evidence of any action against Adamson.

Almost a year later, on May 12, 1982, Father Korf wrote in a memo to himself, "I need to talk with Tom," after a secretary reported that two boys were calling Adamson as frequently as every day. In addition, Korf noted rumors that Adamson had been seen on the golf course with "the boy from Immaculate Conception."

Then, in a September 30, 1982 note to the file, Korf recorded a conversation with Dr.

Gendron. Korf wrote that Gendron felt Adamson was making progress, but was "still at risk and will continue to be a risk." Father Korf also wrote that Gendron refused to recommend that Adamson be placed in a pastorate.

In February 1983, yet another incident came to the Archdiocese's attention. This time, the police had received a report that Adamson had fondled a boy in a health club whirlpool. The boy's mother discounted his report and the police chose not to pursue the matter. Father Korf wrote that, although Adamson had broken one of the terms of the agreement, Archbishop Roach recommended that they be "immensely fair" with him. The result of this incident was that the Archdiocese clarified with Adamson the terms of the no-youth contact policy and reduced them to writing.

Finally, in June 1984, the Archdiocese learned, upon the filing of a lawsuit by the victim, that Adamson had sexually abused a boy in the 1970s while at Saint Thomas Aquinas. As a result of this revelation, Archbishop Roach removed Adamson from his post at Risen Savior in January 1985. Although he technically remains a priest, Adamson has not received an assignment since.

## B. Adamson's Abuse of Mrozka

Thomas Mrozka and his family were parishioners at Immaculate Conception. Mrozka was thirteen at the time Adamson joined the parish in 1979. Adamson took an interest in Mrozka and began inviting him on athletic outings, including golfing and playing racquetball. Their sexual relationship began in October 1979 and continued until February 1987.

While at Immaculate Conception, Adamson's sexual activities with Mrozka took a variety of forms, happened in numerous locations, and occurred up to five days a week. In the first two years after Adamson's transfer to Risen Savior, he had sex with Mrozka about ten times a month. They also had sex when Mrozka stayed at the rectory one or two weeks a summer and when he accompanied Adamson on overnight trips to Rochester. Thus, as Mrozka put it at trial, Adamson "was a big part of my life" between

December 1980 and the spring of 1984. During this period Adamson introduced Mrozka to alcohol. Mrozka subsequently became an alcoholic and, at one point, was treated for alcoholic gastritis.

Following Mrozka's graduation from high school in 1984, his relationship with Adamson continued, but contacts were less frequent. After Adamson left Risen Savior in January 1985, he continued to see Mrozka when he visited in the Twin Cities.

Over the years, Mrozka became increasingly confused about and ashamed of his sexual relationship with Adamson. He finally ended it in February 1987 at the age of twenty-one after learning, through media coverage of the 1984 lawsuit that precipitated Adamson's final departure from service, that Adamson had had relationships with other boys. Discovering these other relationships made Mrozka feel "hurt" and "used."

According to the expert testimony, Mrozka suffers from depression, post-traumatic stress disorder, anxiety, and alcoholism as a result of Adamson's long-term abuse. Dr. Matthew Blinder, a psychiatrist, testified at trial that Mrozka fits the classic pattern of male sex abuse victims, who perceive themselves as worthless except for their sexual organs, feel unworthy because they were passive participants in sexual molestation, are unable to connect sex with love and intimacy, are prone to depression, and who, as adults, are full of shame, powerlessness, and distrust.

Dr. Blinder stated that "at about age 13, 14, [Mrozka's] growth as an individual became arrested or fixed at the early teenage years. All the energy that should have been devoted to growing up instead was consumed by these (sic) fairly hot and heavy continuous and destructive involvement with his priest." Thus, Blinder testified, Mrozka was not emotionally an adult and would not be able to recapture his lost "developmental years." Dr. Blinder likened Adamson's abuse to cancer; if detected early, the damage might have been successfully excised. But after "such a prolonged, egregious period of molestation, the problem gets incorporated into their very being ..., it's fused into their

entire personality." This sort of damage, Blinder said, is "hard to rout ... out."

Following the ruling on the cross-motions for summary judgment in this case, the defendants sought expert testimony on whether Mrozka suffered personal injury in each of the insurance policy periods in effect during Adamson's abuse of Mrozka. Aetna and Interstate offered the testimony of Dr. Patricia Aletky, a psychologist with substantial experience with sexual abuse victims. Dr. Aletky testified that each act of sexual abuse a child suffers causes additional psychological injury. Echoing Dr. Blinder's testimony, she stated that the duration of an abusive relationship is significant because time spent in the relationship is time *not* spent in normal, healthy activities. Thus, Aletky opined, it was "highly, highly improbable" that Mrozka did not sustain additional injury in each additional year of abuse.

Lloyd's retained Dr. Alysa Ruddell, a psychologist with less experience and less impressive qualifications than Dr. Aletky. Ruddell opined that a child experiences psychological "trauma" from a single act of sexual abuse, but that further acts do not "necessarily" cause additional emotional trauma. As to Mrozka, Dr. Ruddell concluded he had suffered damage the first time Adamson abused him, but did not express any opinion as to whether he suffered all of the damage in the first year of abuse, or whether he continued to suffer further damage in the ensuing years.

## C. The Award in the Underlying Trial and the Stipulation Apportioning Fault

In the underlying sexual abuse action, the jury found for Mrozka, awarding him $855,000 in compensatory and $2,000,000 in punitive damages. The trial court reduced the awards, entering judgment of $821,250 in compensatory and $200,000 in punitive damages. With interest, the compensatory award totaled $924,570. The parties paid the judgment pursuant to an interim funding agreement which preserved their rights against each other. Under this agreement, Aetna contributed $127,258, the Archdiocese $103,884, Lloyd's $127,778, and Interstate $565,650. The Diocese did not contribute any interim funding.

Because the jury in the underlying action was not asked to apportion fault between the churches, the churches have stipulated between themselves that the Archdiocese is liable for 45 percent and the Diocese for 55 percent of the compensatory damages. Although none of the insurers is a part of this stipulation, none challenges it.

## D. The Churches' Insurance Coverage

Aetna insured the Archdiocese from July 1, 1979 through August 30, 1980. Aetna's policy covers "ultimate net loss in excess of ... $10,000 which the insured shall become legally obligated to pay as damages because of ... personal injury ... caused by an occurrence." The policy defines an occurrence as "an accident, including continuous or repeated exposure to conditions, which results in personal injury which is neither expected nor intended from the standpoint of the insured." The policy applies only to personal injury "which occurs during the policy period." The limit of liability is $3,000,000 for each occurrence. Thus, for personal injury damages of more than $3,000,000 flowing from one occurrence, the Archdiocese would pay the first $10,000, Aetna would pay the next $2,990,000, and the remainder would be uninsured.

On September 1, 1980, the Archdiocese replaced Aetna's policies with a Protected Self–Insurance Program. Similar programs, marketed as the "Bishop's Plan" by the same brokerage and involving the same insurers, were apparently popular across the country. Under that program, the Archdiocese insured itself up to $100,000 per occurrence. This feature is known as a "self-insured retention," or "SIR." The Archdiocese purchased two layers of insurance for losses in excess of the SIR. Lloyd's provided the first layer, with a limit of $100,000 per occurrence, and Interstate provided the second, with a limit of $4,800,000 per occurrence. Thus, for damages of more than $5,000,000 flowing from one occurrence, the Archdiocese would pay the first $100,000, Lloyd's would pay the second $100,000, Interstate would pay the

next $4,800,000, and the amount in excess of $5,000,000 would be uninsured.

Lloyd's policies are similar to Aetna's in that they cover damages "on account of personal injuries ... arising out of any occurrence happening during the period of insurance." In language similar to that in Aetna's policy, the Lloyd's policies define an "occurrence" as "an accident or a happening or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury ... during the policy period." Lloyd's policy periods were one year long and began on September 1. Beginning on September 1, 1986, Lloyd's policies specifically excluded coverage for personal injury caused by sexual abuse.

Interstate's policies generally incorporated the terms of Lloyd's policies, and thus are "following form" policies. Like Lloyd's, they "appl[y] to injury ... taking place during this policy period." For the purposes of this lawsuit, the only difference between Interstate's and Lloyd's policies is that Interstate's included a sexual abuse exclusion beginning on September 1, 1985, a year earlier than Lloyd's.

The Diocese's insurance throughout the relevant period was essentially identical to the Archdiocese's Bishop's Plan, except that the Diocese's policy periods began on July 1 of each year; its SIR per occurrence was $75,000 before July 1, 1983; and its SIR per occurrence was $100,000 after that date. Lloyd's covered the next $125,000 per occurrence up to July 1, 1983, after which it covered the next $100,000. In all of the relevant policy periods Interstate covered the next $4,800,000 per occurrence.

## E. The Coverage Dispute

Despite minor disagreements on some of the details of Adamson's pedophilia and the churches' knowledge of it, all of the parties are essentially in agreement with the facts as stated above. All parties concur that the abuse began in October 1979 and continued through February 1987. Additionally, all agree that if Mrozka's abuse constituted a covered occurrence, it was a single, continuing occurrence that spanned eight one-year policy periods.

The Archdiocese contends that the compensatory damage award is a covered occurrence because the churches did not expect or intend that Adamson abuse Mrozka. The Archdiocese also argues that, because there was only one occurrence and it reasonably expected to pay only one SIR per occurrence, it is responsible for only one SIR.

The Diocese's position is substantially similar to the Archdiocese's, except that it adds as a basis for the single SIR position the position that the court should deem Mrozka's damage to have occurred entirely in one policy period.

Aetna contends that the ongoing abuse triggered each policy period in effect between October 1979 and February 1987. Aetna further argues that the policy in effect during each period covers only that portion of Mrozka's injury that occurred during that policy period, and thus, that the damage award must be apportioned between the triggered policies. Finally, Aetna agrees with the churches that, because there was only one occurrence, the churches are responsible for only one SIR and the primary insurers are responsible for only one policy limit of coverage.

Lloyd's contends that there was no occurrence, and therefore no coverage, because the churches did or should have expected Adamson's abuse of Mrozka. In the event the court does find coverage, however, Lloyd's contends, it should deem the damage to have occurred all at once when the abuse began, that is, at the time of Mrozka's "first encounter" with Adamson. Under Lloyd's first encounter theory, all of the loss would be allocated to the policy period in which the occurrence began. Thus, Aetna would be liable for all of the loss attributable to the Archdiocese, Lloyd's would be liable for one policy limit on the Diocese's share of the loss, i.e., $125,000, and Interstate would be liable for the rest of the loss attributable to the Diocese.

Interstate joins in Lloyd's position that there was no occurrence and therefore no coverage. Interstate had argued prior to

trial that if Mrozka's abuse is covered, it constitutes multiple occurrences. Now, however, it agrees with the other four parties that if there was an occurrence, there was only one. And, like Aetna, Interstate takes the position that the policy in effect during each period covers only damage that occurred during that period, and thus that the total injury must be allocated between the triggered policy periods. Unlike Aetna, however, Interstate argues that each triggered policy period requires the churches to pay a new SIR. Similarly, Interstate would require Lloyd's, the primary insurer, to pay up to the policy limit in each policy period. Thus, under its position, Interstate would pay nothing because the damages allocated to each policy period would not exceed the sum of the churches' SIRs and Lloyd's policy limits.

### F. The Motions for Summary Judgment

In 1992, each of the parties moved for summary judgment. The court denied all motions except for the requests for a declaration that Minnesota law does not permit insurance to cover punitive damage awards. *Winona,* 841 F.Supp. at 899.

The 1992 order rejected Lloyd's and Interstate's argument that the doctrine of issue preclusion required a finding that the churches expected Mrozka's abuse. In the underlying trial, the jury assessed punitive damages upon finding that the churches acted with "willful indifference or deliberate lack of concern for the rights or safety of others," and that they were "reckless in employing an unfit agent." (*See* Gunderson Aff., Exh. E (special verdict form).) This court concluded that the issue before the jury was not identical to the issue of whether the churches expected the abuse. *Winona,* 841 F.Supp. at 896–97. The court went on to conclude that whether the churches expected Adamson to abuse Mrozka was an issue of fact to be determined at trial. *Id.* at 897.

The 1992 order also rejected Lloyd's first encounter theory. The court reasoned that coverage would be triggered in each policy period in which there was both negligent supervision and resulting damage. *Id.* at 898–99. Left for trial was the fact issue of

whether there was negligent supervision and personal injury in each policy period. *Id.* at 899.

### II. Findings of Fact and Conclusions of Law

### A. Whether the Churches are Entitled to Coverage

The insurers offer three arguments for finding that Mrozka's abuse is not covered: 1) Adamson's conduct was intentional, 2) the jury's finding of recklessness precludes the churches from arguing that they did not expect the abuse, and 3) the churches expected the abuse.

### 1. Whether the Fact that Adamson's Conduct was Intentional Precludes Coverage

■ First, Lloyd's argues that because Father Adamson's conduct was intentional, there was no "occurrence," and, therefore, no coverage. For support, Lloyd's relies on *Old Republic Ins. Co. v. Comprehensive Health Care Associates, Inc.,* 786 F.Supp. 629 (N.D.Tex.1992), *aff'd on other grounds,* 2 F.3d 105 (5th Cir.1993), and *Commercial Union Ins. Cos. v. Sky, Inc.,* 810 F.Supp. 249 (W.D.Ark.1992). Both of these cases involved an action against an employer for the negligent hiring or supervision of an employee who had intentionally injured a third party. As noted above, the policies in this case do not cover damages that the insured "expects" or "intends." Both courts refused to sever the employer's alleged negligence from the employee's intentional conduct and, therefore, concluded that there was no occurrence and no coverage.

This court, however, agrees with the trenchant reasoning in *United States Fidelity and Guarantee Co. v. Open Sesame Child Care Center,* 819 F.Supp. 756, 760 (N.D.Ill. 1993), and *Silverball Amusement, Inc. v. Utah Home Fire Ins. Co.,* 842 F.Supp. 1151, 1154–65 (W.D.Ark.1994), that a refusal to treat the employer's negligent supervision as separate from the employee's intentional conduct is an unduly restrictive interpretation of policies like those involved in this case. Lloyd's emphasis on the intentionality of

Adamson's conduct is especially inappropriate in light of Lloyd's policy exclusion for "liability of any Assured for assault and battery committed by or at the direction of such Assured." By implication, Lloyd's policies do cover liability for intentional torts *not* committed at the direction of the insured.

## 2. Issue Preclusion

Next, Lloyd's and Interstate argue that the jury's finding of willful, deliberate, and reckless conduct precludes the churches from contending that they did not expect Mrozka's abuse.

The jury in the underlying action awarded punitive damages to Mrozka upon finding that the churches acted with "willful indifference or a deliberate lack of concern for the rights or safety of others," and were "reckless in employing an unfit agent." (Gunderson Aff., Exh. E. (special verdict form).) Lloyd's and Interstate argue that these findings are tantamount to a finding that the churches expected the abuse Mrozka suffered. Therefore, Lloyd's and Interstate contend, the doctrine of issue preclusion bars the churches from asserting in this lawsuit that they did not expect Mrozka's abuse.

■■■ The doctrine of issue preclusion bars the relitigation of an issue identical to one necessarily resolved on the merits in a prior adjudication between the parties where the parties had an opportunity for a full and fair hearing on that issue in the prior adjudication. *Johnson v. Consolidated Freightways, Inc.*, 420 N.W.2d 608, 613 (Minn.1988). The court stands by its prior ruling that whether the churches were guilty of recklessness and willful indifference or a deliberate lack of concern is not identical to whether the churches "intended" Adamson to abuse Mrozka.

■■■ The insurance policies involved in this case are comprehensive general liability (CGL) policies. The purpose of a CGL policy, like any insurance policy, is to control the risk that a particular entity will incur a large liability by distributing such losses among a large number of insureds. *See Bituminous Casualty Corp. v. Bartlett*, 307 Minn. 72, 240 N.W.2d 310, 313 (1976), *rev'd in part on*

*other grounds, Prahm v. Rupp Construction Co.*, 277 N.W.2d 389 (Minn.1979). Therefore, CGL policies cover only those losses that are uncertain or fortuitous from the standpoint of any single insured. *Id.* Accordingly, the insured reasonably expects coverage for losses resulting from mistakes or carelessness, but not for losses from risks that it "consciously control[s]." *Id.*

■■■ The policies in this case cover "occurrences," and thus are "occurrence-based" policies. Occurrence-based policies, the traditional form of CGL insurance, cover any occurrence that happens within the policy period, regardless of when the insured submits the claim. *See Hartford Fire Ins. Co. v. California*, — U.S. —, —, 113 S.Ct. 2891, 2896, 125 L.Ed.2d 612 (1993). "Claims-made" policies, by way of contrast, obligate the insurer to cover only those claims made during the policy period. *Id.*

Lloyd's and Interstate's policies define an occurrence as an accident, event, or happening that "unexpectedly and unintentionally" results in a loss. Similarly, Aetna's policy defines an "occurrence" as an accident that is "neither expected nor intended from the standpoint of the Insured."

The insurers do not assert that the churches intended that Adamson abuse Mrozka. The issue, therefore, is whether the churches expected the abuse. A line of Minnesota decisions applies the term "expected" as used in occurrence-based CGL policies. *See Bituminous*, 307 Minn. 72, 240 N.W.2d at 313; *Continental Western Ins. Co. v. Toal*, 309 Minn. 169, 244 N.W.2d 121, 124–125 (1976); *Ohio Casualty Ins. Co. v. Terrace Enterprises, Inc.*, 260 N.W.2d 450, 452–53 (Minn.1977); *Farmers Union Oil Co. v. Mutual Service Ins. Co.*, 422 N.W.2d 530, 532–33 (Minn.App.1988); *Sylvester Brothers Development Co. v. Great Central Ins. Co.*, 480 N.W.2d 368, 372–73 (Minn.App.1992); *see also Auto–Owners Ins. Co. v. Jensen*, 667 F.2d 714, 717–20 (8th Cir.1981) (interpreting Minnesota law). These decisions establish that whether an event is "expected" must be determined from the objective standpoint of a prudent policyholder. *Sylvester Brothers*, 480 N.W.2d at 372.

In addition, although no Minnesota state court has defined the term, the Eighth Circuit has predicted on the basis of Iowa law that the Minnesota Supreme Court would define "expected" for these purposes to mean "substantially probable" or "highly likely to occur."[1]  *Auto–Owners,* 667 F.2d at 720.

Neither the Minnesota courts nor the Eighth Circuit has, however, clearly addressed the relationship between expectation and recklessness. Several opinions do suggest, without holding, that recklessness entails expectation. The *Bituminous* court explained that "If the single insured is allowed through intentional or reckless acts to consciously control the risks covered by the policy, a central concept of insurance is violated." 307 Minn. 72, 240 N.W.2d at 313. Similarly, the *Ohio Casualty* court found coverage because the insured's conduct was "perhaps negligent, but not reckless or intentional." 260 N.W.2d at 453. Finally, in *Farmers Union,* the insured had sprayed a farmer's corn crop with an herbicide whose label cautioned against use on corn. 422 N.W.2d at 533. Such an "off-label" use is illegal. *Id.* The court affirmed the jury's finding that the insured was reckless because the insured "knew of the substantial risks involved, proceeded in light of this knowledge, and disregarded the known hazard." *Id.* This recklessness, the court held, precluded coverage. *Id.*

Although these decisions imply that, in at least some circumstances, recklessness equates to expectation, none establishes the rule that the insurers urge—that a finding of recklessness with respect to a certain harm necessarily embraces a finding that the harm was expected. Moreover, none of these opinions addresses whether recklessness equates to expectation for the purposes of issue preclusion. Therefore, this court must deduce

what the Minnesota Supreme Court would hold.

In support of their position, Interstate and Lloyd's cite a decision by the Missouri Court of Appeals, *Farm Bureau Town & Country Ins. Co. of Missouri v. Turnbo,* 740 S.W.2d 232 (Mo.App.1987). Farm Bureau's insured, Turnbo, pled guilty to misdemeanor assault and battery. *Id.* at 233. The information charged that Turnbo "recklessly caused physical injury" to the victim. *Id.* Turnbo's victim subsequently brought a tort claim, alleging that Turnbo's conduct was in "reckless ... disregard" of his safety. *Id.* at 234. Farm Bureau argued that it had no duty to defend or indemnify Turnbo on the grounds that his reckless conduct produced an expected result, and thus, that his recklessness did not constitute a covered occurrence. *Id.* The *Turnbo* court disagreed with the insurance company, holding that " 'expect' squares with the legal definition of 'reckless.' " *Id.* at 236.

The court declines to follow *Turnbo* for two reasons. First, *Turnbo* was implicitly overruled on this issue when the Missouri Supreme Court rejected the contention that a showing that the insured was reckless compels a finding that the insured expected the resulting injury. *American Family Mutual Ins. Co. v. Pacchetti,* 808 S.W.2d 369, 371 (Mo.1991). The *Pacchetti* court wrote "Although recklessness is sometimes the legal equivalent of intention, liability insurance would be of scant value if coverage were to turn on a jury's finding that the insured acted recklessly rather than negligently." *Id.*

This court also disagrees with the definition of recklessness in *Turnbo.* The *Turnbo* court held that recklessness necessarily involves a "strong probability that harm may result." *Id.,* 740 S.W.2d at 235 (citing Re-

---

1. This definition of expect seems to square neither with the ordinary meaning of that term, nor with the purposes for which insurance is written. First, while a person obviously expects consequences which he or she considers highly likely, not all expected consequences are highly likely. Rather, one "expects" anything one considers more likely than not to occur. *See, e.g.,* Webster's Third New International Dictionary (1986) ("expect," definition 4b: "to consider probable *or* certain" (emphasis added)). Second, as the

Minnesota Supreme Court has explained, insurance is not intended to cover losses from risks which an insured consciously controls. *Bituminous,* 307 Minn. 72, 240 N.W.2d at 313. An insured that acts in manner which he or she believes is more likely than not to produce a particular harm is consciously controlling the risk of loss from that harm. Thus, as a definition of "expect," "more likely than not" more closely effectuates the purposes of an insurance policy than does "highly likely to occur."

statement (Second) of Torts § 500 comment f. (1965)). Under this definition, conduct that creates a less than strong probability of extreme harm cannot be termed reckless.

This definition does not square with the ordinary meaning of recklessness. For example, suppose that for purely economic reasons a nuclear utility instituted a policy that incidentally created a forty-five percent probability of an accident resulting in large-scale fatalities. The utility's decision surely would be reckless under the ordinary understanding of that term, but not under the "strong probability" definition.

The flaw in the "strong probability" definition of recklessness is its exclusive focus on probability. The term "expected," in the context of CGL insurance, does indeed refer to a single concept—it denotes a belief that a particular event will probably or certainly occur. *See* Webster's Third New International Dictionary (1986) ("expect," definition 4b: "to consider probable or certain"). Under the Eighth Circuit/Minnesota "substantially probable" or "highly likely to occur" definition of "expect," that term appears on the continuum of certainty somewhere between "more likely than not" and "beyond a reasonable doubt."

The concept of recklessness, on the other hand, is more complex. Recklessness and negligence do not appear on the continuum of certainty of knowledge; rather, they represent degrees of culpability. *See* Restatement (Second) of Torts § 500 (1965) (defining reckless disregard of safety as the doing of an act with knowledge or with reason to have knowledge that would lead a reasonable person to realize that the conduct creates an unreasonable risk of harm substantially greater than that which would make the conduct negligent). Determining whether a party was reckless requires two determinations: whether the relevant harm was foreseeable and whether risking its occurrence was reasonable. *See id.* Determining whether taking the risk was reasonable involves, in turn, weighing the foreseeable likelihood that the harm would occur against its foreseeable severity.

Thus, as the nuclear utility example demonstrates, if the foreseeable harm is suffi-

ciently severe, even an action that creates only a slight likelihood of harm could be considered reckless. By definition, however, that harm cannot be described as "expected" because the likelihood of its occurrence is less than "more likely than not" on the certainty spectrum.

■ This distinction between recklessness and expectation is reflected in the Eighth Circuit's analysis in *Auto–Owners* of the relationship between negligence and expectation. The district court in *Auto–Owners* had instructed the jury that harm caused by negligence is necessarily unexpected for the purposes of insurance coverage. 667 F.2d at 718. The Eighth Circuit acknowledged that CGL policies do cover some negligence. *Id.* at 719. However, the court explained, it does not follow that because CGL policies cover some negligence, they cover all negligence. *Id.* Rather, some merely negligent conduct may include an expectation that harm will ensue. *Id.* This logic applies to recklessness; it does not follow that because CGL policies do not cover some recklessness, they cover no recklessness.

Interstate and Lloyd's also cite decisions of the Seventh Circuit Court of Appeals in support of their position that the consequences of recklessness are necessarily expected. Two Seventh Circuit opinions hold that, under Illinois law, the results of reckless acts are expected as a matter of law. *See Calvert Ins. Co. v. Western Ins. Co.*, 874 F.2d 396, 400–01 (7th Cir.1989); *Mutual Service Casualty Ins. Co. v. Country Life Ins. Co.*, 859 F.2d 548, 552–53 (7th Cir.1988). These decisions are inapposite because Illinois's definition of "expected" differs from Minnesota's. Illinois's definition is "reasonably anticipated." *Calvert*, 874 F.2d at 400. This is a lesser standard than "substantially probable" or "highly likely to occur." *Auto–Owners*, 667 F.2d at 717–20.

The court concludes, therefore, that whether the churches were reckless for the purpose of assessing punitive damages is not identical to whether, for the purposes of insurance coverage, they expected Mrozka's abuse. The jury's finding of recklessness in

the underlying trial, accordingly, has no issue preclusive effect in this case.

### 3. Whether the Churches Expected Mrozka's Abuse

██ The insurers' third argument is that the court should hold that the policies do not cover Mrozka's damages because it should make the factual finding that the churches expected Adamson to abuse Mrozka. As stated above, the relevant standard is whether a prudent policy holder in the churches' position would have concluded that Mrozka's abuse was substantially probable or highly likely to occur. *Sylvester Brothers*, 480 N.W.2d at 372; *Auto–Owners*, 667 F.2d at 720. In this case, that determination is a very close one.

The court finds that a prudent person in the churches' position would have determined at some point before Mrozka's abuse began in 1979 that Adamson was more likely than not to continue to abuse boys. The court is unable, however, to find that such a person would have determined before Adamson left Risen Savior in January 1985 that further pedophilia on his part was substantially probable or highly likely to occur.

### B. Who Pays and How Much

The conclusion that the insurance policies cover Mrozka's damages because the churches did not "expect" Mrozka's abuse requires the court to go on to address one of the more complex issues in insurance law—the extent to which CGL policies cover injuries that extend over multiple policy periods. Given the facts of this case and the parties' contentions, the court must first determine in which policy periods the injury triggered coverage. The court must then decide how many occurrences Mrozka's abuse constitutes. Third, the court must conclude how many SIRs the churches must pay and how many policy limits Lloyd's must pay. Finally, the court must determine how to apportion the damages, SIRs, and policy limits among the policy periods.

### 1. Which Policies are Triggered

██ The first step is determining whether coverage is "triggered." Whether there was an occurrence is one aspect of the trigger analysis. The court has already concluded that there was an occurrence or occurrences. Therefore, what remains is to determine which, if any, policy periods were triggered.

The language of the policies governs the trigger analysis. As stated above, Aetna's policy covers "damages because ... of personal injury ... caused by an occurrence." The policy defines an occurrence as "an accident, including continuous or repeated exposure to conditions, which results in personal injury." The policy covers "only ... personal injury ... which occurs during the policy period." Similarly, Lloyd's policy covers "damages on account of personal injuries ... arising out of any occurrence happening during the period of insurance." Lloyd's policy defines an "occurrence" as a "continuous or repeated exposure to conditions which ... results in personal injury ... during the policy period."

On their faces, both of these policies plainly state that coverage is triggered when personal injury occurs within the policy period. The policies are equally clear that a particular policy period is not triggered by and does not cover any injury that occurs outside that period.

Courts have used numerous approaches in determining whether a policy is triggered. *See Industrial Steel Container Co. v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156, 159 (Minn.App.1987) (describing five trigger theories developed by courts around the country). For example, under the "exposure rule," an injury is deemed to have occurred at the time of exposure to an injury-causing condition, regardless of when the injury itself occurs. *See, e.g., Insurance Co. of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1219 (6th Cir.1980), *reh'g granted*, 657 F.2d 814 (1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), *reh'g denied*, 455 U.S. 1009, 102 S.Ct. 1648, 71 L.Ed.2d 878 (1982). Under the "manifestation rule," an injury is deemed to have occurred only when it first becomes apparent to the injured party. *See, e.g., Eagle–Picher Industries, Inc. v. Liberty Mu-*

*tual Ins. Co.,* 682 F.2d 12, 19 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). Two other theories, the "double trigger" and "triple trigger" rules, are variations on the exposure and manifestation rules. *See Industrial Steel,* 399 N.W.2d at 159. Each of these four rules could be interpreted to require a policy in effect in one period to cover injuries or damage happening in other policy periods. Such an interpretation would be inconsistent with the language of occurrence-based CGL policies, which restrict coverage to injuries happening within the policy period.

The Minnesota Supreme Court has adopted a fifth theory, known as the "actual injury rule." *See Singsaas v. Diederich,* 307 Minn. 153, 238 N.W.2d 878, 880 (1976) (adopting the rule without using this term); *Industrial Steel,* 399 N.W.2d at 159 (describing *Singsaas* as having adopted the exposure rule). The actual injury rule interprets occurrence-based CGL policies in accord with their plain meaning. Analyzing a policy similar to those in this case, the Court held that an occurrence happens "not [at] the time the wrongful act was committed but the time the complaining party was actually damaged."[2] *Singsaas v. Diederich,* 307 Minn. 153, 238 N.W.2d 878, 880 (1976). Therefore, although the negligence in *Singsaas* occurred during the policy period, because the injury resulted after the policy period had expired, the Court held that coverage was not triggered. *Id.* 307 Minn. 153, 238 N.W.2d at 881–82; *see also Jostens, Inc. v. CNA Insurance/Continental Casualty Co.,* 403 N.W.2d 625, 630–31 (Minn.1987) (reaffirming *Singsaas*).

The parties agree that Mrozka's abuse began in October of 1979 and continued until February of 1987. During this time, the Archdiocese's policy periods ran for one year with an anniversary date of September 1.

The Diocese's policy periods were also one year long, but its anniversary date was July 1. Thus, eight policy periods are implicated:

| Policy Period | Year | Insurer | |
| --- | --- | --- | --- |
| | | Archdiocese | Diocese |
| 1 | 1979–80 | Aetna | Lloyd's/ Interstate |
| 2 | 1980–81 | Lloyd's/ Interstate | " |
| 3 | 1981–82 | " | " |
| 4 | 1982–83 | " | " |
| 5 | 1983–84 | " | " |
| 6 | 1984–85 | " | " |
| 7 | 1985–86 | " | " |
| 8 | 1986–87 | " | " |

The court must determine during which policy periods Mrozka suffered personal injury as a result of Adamson's abuse. The personal injury involved is the emotional trauma Mrozka suffered as a result of Adamson's abuse. Dr. Blinder testified that the time Mrozka spent in his relationship with Adamson damaged him by taking him away from normal activities important to an adolescent's healthy emotional development. Similarly, Dr. Aletky testified that each act of sexual abuse a child suffers causes additional psychological injury. And, like Blinder, she stated that time spent in the abusive relationship is time not spent in normal healthy activities. Thus, Aletky opined that it was "highly, highly improbable" that Mrozka did not sustain additional injury in each additional year of abuse.

Lloyd's contends, nevertheless, that the court should deem all of Mrozka's injury to have occurred at the time Adamson first abused Mrozka. Lloyd's attempts to counter Blinder's and Aletky's testimony with Dr. Ruddell's. Ruddell opined that a single act of sexual abuse causes trauma, and that further acts do not "necessarily" cause additional emotional trauma. As to Mrozka, Ruddell concluded that he suffered damage the first

---

**2.** Strictly speaking, the "occurrence" is the accident or exposure that causes the injury, not the injury itself. This distinction can be important. For example, under Aetna's policy, the timing of the occurrence is irrelevant; only the *injury* must occur within the policy period in order to trigger coverage. ("[O]ccurrence means an accident, including continuous or repeated exposure to conditions, which results in personal injury.... This policy applies only to personal injury ... which occurs during the policy period.") Under Lloyd's policy, on the other hand, both the occurrence and the injury must happen within the policy period. ("Underwriters hereby agree ... to indemnify ... for damages on account of personal injuries ... arising out of any occurrence happening during the period of insurance.... The term 'occurrence' shall mean an accident or a happening or an event or a continuous or repeated exposure to conditions which.... results in personal injury ... during the policy period").

time Adamson abused him, but she expressed no opinion about whether Mrozka in particular suffered all of his damage in the first year of Adamson's abuse.

The court finds preposterous the notion that the entirety of Mrozka's emotional damage occurred the first time he was abused. To contend that the seven and a half years of molestation that followed the first instance of abuse caused no further injury is unthinkable. That is, no doubt, why Dr. Ruddell refused to so opine. Therefore, on the basis of the testimony of Drs. Blinder and Aletky, the court concludes that Mrozka continued to suffer additional personal injury as long as he endured Adamson's abuse.

In addition to its factual argument that Mrozka suffered injury only in policy period one, Lloyd's also offers the "first encounter rule" as a legal basis for its position. Under the first encounter rule, only the policies in effect at the time Mrozka was first abused would be triggered, and these policies would cover all of the damage he suffered, regardless of when it arose.

Lloyd's first encounter rule is inconsistent both with the plain language of the policies and with Minnesota precedent. As noted above, both Aetna's and Lloyd's policies explicitly cover only damages that occur within the policy period. Thus, the policies in effect in period one do not, by their terms, cover damage Mrozka suffered in subsequent policy periods. And, again, as stated above, the controlling Minnesota decisions provide that under policies such as Aetna's and Lloyd's, a policy covers only damages that are incurred within the policy period. The only support for its first encounter position that Lloyd's

proffers are two decisions from other jurisdictions. *See Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. v. Arthur J. Gallagher and Co.*, Civ. No. 88–0289 (W.D.La. May 2, 1991) (adopting first encounter rule in priest pedophilia case); *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56 (3d Cir.1982) (adopting first encounter rule in different context). These decisions are inconsistent with the terms of the policies and with Minnesota law. Moreover, the Fifth Circuit Court of Appeals overruled the *Lafayette* district court's adoption of the first encounter rule as inconsistent with the policy language and potentially unfair to both insurers and insureds. *Society of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Casualty Co.*, 21 F.3d 675 (5th Cir.1994). The court, therefore, declines to follow the opinions Lloyd's cites. Accordingly, the court finds that Mrozka suffered damage in policy periods one through eight.

An exclusion for sexual abuse, however, prevents Interstate's policy from being triggered in periods seven and eight, and Lloyd's from being triggered in period eight. Therefore, the court finds that Aetna's policy is triggered in period one, Lloyd's policies are triggered in periods one through seven, and Interstate's policies are triggered in periods one through six.

### 2. Number of Occurrences

■ An issue distinct from whether coverage is triggered in a particular policy period is the number of occurrences the abuse constitutes. The parties agree that Mrozka's abuse constitutes a single occurrence.[3] But,

3. The Fifth Circuit has cited the earlier order in this case, apparently as support for the position that there is a separate occurrence in each policy period when successive policy periods are triggered by a priest's continuing molestation of a child. *See Society of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Casualty Co.*, 21 F.3d 675 (5th Cir.1994). Although it did not so hold, this court's prior order could be read as suggesting that a single continuing accident or exposure which spans more than one policy period breaks into separate occurrences in each policy period. Such an interpretation, resulting in a "horizontal stacking" of SIRs and policy limits, would be inconsistent with the policy language, with the

intent of the parties to the insurance contract, and with Minnesota Supreme Court precedent. First, the policies' definitions of "occurrence" do not constrain a single occurrence within the boundaries of one policy period. Second, to do so would make the number of SIRs and limits of coverage a function of the fortuity of how many policy periods an accident or exposure happens to span. As discussed below in section II.B.3., this result is surely not one that either party to the insurance contract would have intended. Third, the Minnesota Supreme Court has held that a single occurrence can span multiple policy periods. *See, e.g., Jostens Inc. v. CNA Insur-*

as noted above, they disagree about the duration of that occurrence. The churches, Aetna, and Interstate all agree that the abuse constituted a continuing occurrence that spanned the eight policy periods. However, as just discussed, Lloyd's argues that the occurrence happened all at once the first time Adamson abused Mrozka. As the court has rejected Lloyd's "injury-all-at-once," first encounter theory, it finds that Mrozka's abuse constitutes a single, continuing occurrence that spanned policy periods one through eight.

### 3. Number of SIRs and Policy Limits

The next issue is how many SIRs the churches must pay and how many policy limits Aetna and Lloyd's must pay. Both Aetna's and Lloyd's policies provide that the churches must pay one SIR per occurrence, and Lloyd's provides that it will pay one policy limit per occurrence. The churches, Aetna, and Lloyd's all agree that, because there is only one occurrence, there should be only one SIR and one policy limit. Interstate, however, argues that Aetna's and Lloyd's policies should be read as providing for one SIR and one policy limit "per occurrence, *per policy period.*" No such qualification appears in either policy, nor does Interstate cite any authority that reads such a qualification into an occurrence-based CGL policy.

The only reason to question the otherwise clear import of the "one SIR, one limit per occurrence" provisions is that the drafters of the policies seemingly did not contemplate the possibility that an occurrence might span more than one policy period. This is reflected by the fact that the policies do not address whether or how to allocate damages, SIRs, and policy limits between policy periods for multiple-policy-period occurrences.

Assuming for the sake of argument that the policies are ambiguous, there is, nonetheless, no reason to adopt Interstate's "per occurrence, per policy period" interpretation. Under Interstate's interpretation, even a very short occurrence could require a insured to pay two SIRs where it reasonably would expect to pay only one. For example,

assume a insured has identical occurrence-based policies from the same insurer in consecutive periods. Under Interstate's theory, if the insured's building were to begin burning in the last hour of period one, but continued burning into period two, the insured would have to pay two SIRs, and the primary insurer two policy limits. Had the building burned a day later, however, the insured would have paid only one SIR and the primary insurer only one limit. Surely neither the policyholder nor the insurers would have intended this outcome. Thus, the more reasonable interpretation of the policies is that they require only one SIR and one policy limit per occurrence regardless of how many periods the occurrence spans.

The court's analysis is consistent with the result in *Jostens Inc. v. CNA Insurance/Continental Casualty Co.,* 403 N.W.2d 625 (Minn. 1987). *Jostens* involved a single, continuous occurrence spanning several policy periods. *Id.* at 631. Jostens had different SIRs in different policy periods. *Id.* The court averaged the SIRs, then deducted the average from Jostens' damages. *Id.* In effect, therefore, the court required Jostens to pay only one SIR even though the occurrence spanned several policy periods. *See id.*

Because both Aetna's and Lloyd's policies provide for one SIR and one limit "per occurrence," not "per occurrence, per policy period," the churches must pay only one SIR each and Lloyd's must pay only one policy limit per church.

### 4. Apportionment

The court's final task is to apportion the damages among the two churches and three insurance companies. As the jury in the underlying action did not allocate liability between the churches, the court must do so now. The churches have stipulated between themselves that the Archdiocese is liable for 45 percent of the compensatory damages, and the Diocese for 55 percent. None of the insurers is a party to this stipulation, but no insurer opposes it. As no party opposes the churches' stipulation and the court is aware of no reason not to adopt the stipulated

*ance/Continental Casualty Co.,* 403 N.W.2d 625, 631 (Minn.1987).

allocation, the court does so. Hence, the Archdiocese is liable for $416,056.50 and the Diocese for $508,513.50.

The next matter is allocating liability between the eight policy periods. Under the plain language of the policies, as well as under *Singsaas* and *Jostens,* the policies in effect during a particular policy period cover only damage that occurred during that period. Where one occurrence spans multiple policy periods, the damage must be allocated between the policy periods according to when it happened. *See Jostens,* 403 N.W.2d at 630 (allocating damages between policy periods).

Nevertheless, Lloyd's contends that the Minnesota Court of Appeals decision in *SCSC Corp. v. Allied Mutual Ins. Co.,* 515 N.W.2d 588 (Minn.App.1994) supports its position that damages should be allocated in a manner that would, in this case, have the same result as its first encounter theory. Were *SCSC* binding upon this court, Lloyd's position would have merit. *SCSC,* however, conflicts with the Minnesota Supreme Court's articulation in *Singsaas* of the actual injury rule. *See Singsaas,* 307 Minn. 153, 238 N.W.2d at 880.

In *SCSC,* occasional chemical spills over a number of policy periods contaminated the groundwater under the insured's property. One of the insurers argued that the costs of cleanup should be allocated among all the policy periods during which property damage occurred and in relation to the proportion of injuries that occurred during each policy period. As there was no coverage during some of these periods, this allocation would have required the insured to absorb part of the cleanup costs. The court rejected this approach.

The policy in *SCSC* covered "all sums which [SCSC] shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence." It defined "property damage" as "physical injury to ... tangible property *which occurs during the policy period."* (emphasis added). The *SCSC* court interpreted the term "all sums" to mean that the insurer was required to pay the entire loss flowing from the occurrence,

regardless of whether the injury occurred within the policy period. Thus, although some of the property damage occurred during periods in which SCSC had no coverage, the court required the insurers to pay for the entire amount of the cleanup. As the *Singsaas* and *Jostens* courts established, this interpretation conflicts with the policy's clear limitation of coverage to damages stemming from injuries occurring during the policy period. *See Singsaas,* 307 Minn. 153, 238 N.W.2d at 880; *Jostens,* 403 N.W.2d at 630.

To allocate the damages among the insurers, the *SCSC* court adopted a method it termed a "vertical trigger" approach. The court held that the primary policy in period one was "triggered" first, the excess policy in period one was triggered second, the primary policy in period two was triggered third, and so on. (Despite its use of the term "trigger," the court was at this point engaged in an allocation analysis, not a trigger analysis.) The court required each policy to pay up to its limit before the next was triggered. After the amount of the cleanup had been reached, no further policies were triggered. Again, by requiring a policy in effect in one period to pay damages that happened in another period, this method of allocation conflicts the actual injury rule of *Singsaas* and *Jostens,* as well as with the allocation analysis used in *Jostens. See Singsaas,* 307 Minn. 153, 238 N.W.2d at 880; *Jostens,* 403 N.W.2d at 630–31 (allocating to each policy period only those damages that occurred in that period). Because *SCSC* is inconsistent with Minnesota Supreme Court precedent, this court must disregard its "all sums" analysis and "vertical trigger" allocation approach.

The court must, therefore, determine what portion of Mrozka's damage occurred in each policy period. The churches have not addressed how the damages should be allocated between policy periods. Aetna and Interstate argue that one eighth of the liability should be assigned to each implicated policy period. Lloyd's agrees that, if the court does not adopt its first encounter rule, liability should be divided evenly among the eight policy periods. As there is no evidence in

the record to support allocation between policy periods in any manner other than chronologically, the court finds that this is the proper basis. However, the record does establish the months in which Mrozka's abuse began and ended. Allocating the damages on a monthly basis, rather than an annual basis, would more fairly reflect the fact that Adamson abused Mrozka during only parts of periods one and eight. Therefore, the court finds that a monthly allocation is appropriate.

Adamson's abuse of Mrozka lasted 89 months, from October 1979 through February 1987. For the purposes of allocation, the court will assume that abuse occurred throughout the entire month in October 1979 and February 1987. The Archdiocese's policy periods began on September 1. Because the abuse began in October, 11/89ths of the Archdiocese's liability is allotted to in period one. Then 12/89ths of the Archdiocese's liability is allotted to each of periods two through seven. Finally, 6/89ths is allotted to period eight.

The Diocese's policy periods began on July 1. Therefore, 9/89ths of its liability is allotted to period one. Then 12/89ths is allotted to each of periods two through seven. Finally, 8/89ths of the Diocese's liability is allotted to period eight.

■ The final items to be allocated are the SIRs and policy limits. In *Jostens,* only one insurer was involved and coverage was triggered in each period, but the amount of the SIR changed from period to period. *See* 403 N.W.2d at 631. Therefore, the court calculated the average SIR over the entire period of insurance and deducted that amount from the insurer's liability. *Id.* This case differs in that the Archdiocese had different insurers in different periods, and policy exclusions preclude coverage for both churches during the final periods. Therefore, just as with the total liability, the court will allocate the SIRs and policy limits per policy period on a monthly basis. Thus, for example, the Archdiocese's SIR in period one is 11/89ths of the $10,000 SIR provided for in Aetna's policy. Then, in each of periods two through seven, the Archdiocese is liable for 12/89ths of the $100,000 SIR in the Lloyd's policies.

Under this allocation, the Archdiocese is responsible for the weighted average of the SIRs in Aetna's and Lloyd's policies; the portion of Lloyd's policy limit in period eight, when Lloyd's sexual abuse exclusion was in effect; and the portion of Interstate's excess coverage in periods seven and eight, when Interstate's sexual abuse exclusion was in effect. Aetna is responsible, up to 11/89ths of its $3,000,000 limit of coverage, for the portion of the Archdiocese's liability allocated to period one less the same proportion of the SIR under its policy. Lloyd's is responsible for its $100,000 limit of coverage less the portions of liability allocated to period one, when Aetna's policy was in effect, and period eight, when the policy exclusion was in effect. Interstate is responsible for the remainder of the Archdiocese's liability within its $5,000,000 limit of coverage less the liability in period one, which belongs to Aetna, and the liability in periods seven and eight, when its policy exclusion was in effect.

The Diocese is responsible for one SIR (the weighted average of its $75,000 and $100,000 SIRs), for Lloyd's portion of the liability in period eight, and for Interstate's portion of the liability in periods seven and eight. Lloyd's is thus responsible for the weighted average of its $125,000 and $100,000 limits of coverage with respect to the Diocese, less the portion of liability allocated to period eight. Finally, Interstate is responsible up to its $5,000,000 limit for the remainder of the Diocese's liability less the portion of its liability allocated to periods seven and eight. These allocations are reflected in the following tables:

## ARCHDIOCESE

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 1 | $51,422.71 | $ 1,235.96 .<br>Arch. | 50,186.75<br>Aetna | — |
| 2 | 56,097.48 | 13,483.14<br>Arch. | 13,483.14<br>Lloyd's | 29,131.20<br>Inter. |
| 3 | 56,097.48 | 13,483.14<br>Arch. | 13,483.14<br>Lloyd's | 29,131.20<br>Inter. |
| 4 | 56,097.48 | 13,483.14<br>Arch. | 13,483.14<br>Lloyd's | 29,131.20<br>Inter. |
| 5 | 56,097.48 | 13,483.14<br>Arch. | 13,483.14<br>Lloyd's | 29,131.20<br>Inter. |
| 6 | 56,097.48 | 13,483.14<br>Arch. | 13,483.14<br>Lloyd's | 29,131.20<br>Inter. |
| 7 | 56,097.48 | 13,483.14<br>Arch. | 13,483.14<br>Lloyd's | 29,131.20<br>Arch. |
| 8 | 28,048.74 | 6,741.57<br>Arch. | 6,741.57<br>Arch. | 14,565.60<br>Arch. |

## DIOCESE

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 1 | $51,422.66 | $ 7,584.26<br>Diocese | 12,640.44<br>Lloyd's | 31,197.96<br>Inter. |
| 2 | 68,563.59 | 10,112.36<br>Diocese | 16,853.93<br>Lloyd's | 41,597.30<br>Inter. |
| 3 | 68,563.59 | 10,112.36<br>Diocese | 16,853.93<br>Lloyd's | 41,597.30<br>Inter. |
| 4 | 68,563.59 | 10,112.36<br>Diocese | 16,853.93<br>Lloyd's | 41,597.30<br>Inter. |
| 5 | 68,563.59 | 13,483.14<br>Diocese | 13,483.14<br>Lloyd's | 41,597.30<br>Inter. |
| 6 | 68,563.59 | 13,483.14<br>Diocese | 13,483.14<br>Lloyd's | 41,597.30<br>Inter. |
| 7 | 68,563.59 | 13,483.14<br>Diocese | 13,483.14<br>Lloyd's | 41,597.30<br>Diocese |
| 8 | 45,709.06 | 8,988.76<br>Diocese | 8,988.76<br>Diocese | 27.731.54<br>Diocese |

Thus, the parties are liable for the *Mrozka* compensatory judgment in the following amounts, rounding to the nearest dollar:

| | | | |
|---|---|---|---|
| Archdiocese | | | $139,315 |
| Diocese | | | 165,677 |
| Aetna | | | 50,187 |
| Lloyd's | | | |
| | Archdiocese policy | $ 80,899 | |
| | Diocese policy | 103,652 | |
| | | 184,551 | 184,551 |
| Interstate | | | |
| | Archdiocese policy | $145,656 | |
| | Diocese policy | 239,184 | |
| | | 384,840 | 384,840 |
| Total: | | | 924,570 |

The last matter is how much each party owes or is owed in light of its contribution to the settlement pool. The Archdiocese, the Diocese, and Lloyd's all contributed less than they are liable for. Therefore, they each owe to Aetna and Interstate the difference between their contribution to the settlement pool and their liability. The sum that each of the Archdiocese, the Diocese, and Lloyd's owes will be divided between Aetna and Interstate according to the ratio between the refunds that Aetna and Interstate are owed. These calculations are set out in the following table:

| | Settlement Contribution | Liability | Refund or (Payment) | Division of Payment | |
|---|---|---|---|---|---|
| Archdiocese | $103,884 | $139,315 | ($ 35,431) | Aetna:<br>Interstate: | $10,589<br>24,842 |
| Diocese | — | 165,677 | ( 165,677) | Aetna:<br>Interstate: | 49,515<br>116,162 |
| Aetna | 127,258 | 50,187 | 77,071 | | |
| Lloyd's | 127,778 | 184,551 | ( 56,773) | Aetna:<br>Interstate: | 16,967<br>39,806 |
| Interstate | 565,650 | 384,840 | 180,810 | | |

As Aetna made its payment to the settlement pool on December 16, 1991, it is owed prejudgment interest under Minn.Stat. § 549.09 (1993) from that date through the date judgment is entered in this matter. Interstate is similarly owed interest from January 6, 1992, the day it made its settlement contribution, through the date judgment is entered.

ACCORDINGLY, THE COURT ORDERS THAT:

1) the parties are liable in the following amounts for the compensatory damage award in *Mrozka:*

| | |
|---|---|
| Archdiocese of Saint Paul and Minneapolis | $139,315 |
| Diocese of Winona | 165,677 |
| Aetna Casualty and Surety Company | 50,187 |
| Underwriters at Lloyd's, London | 184,551 |
| Interstate Fire and Casualty Company | 384,840 |

2) Aetna Casualty and Surety Company is entitled to judgment, along with additional interest as allowed under Minn.Stat. § 549.09 from December 16, 1991 through the date judgment is entered in this matter, in the following amounts against the following parties:

| | |
|---|---|
| Archdiocese of Saint Paul and Minneapolis | $10,589 |
| Diocese of Winona | 49,515 |
| Underwriters at Lloyd's, London | 16,967 |

3) Interstate Fire and Casualty Company is entitled to judgment, along with additional interest as allowed under Minn.Stat. § 549.09 from January 6, 1992 through the date judgment is entered in this matter, in the following amounts against the following parties:

| | |
|---|---|
| Archdiocese of Saint Paul and Minneapolis | $ 24,842 |
| Diocese of Winona | 116,162 |
| Underwriters at Lloyd's, London | 39,806 |

LET JUDGMENT BE ENTERED ACCORDINGLY.