DIOCESE OF WINONA, a Minnesota non-profit religious corporation, Plaintiff,

v.

INTERSTATE FIRE & CASUALTY COMPANY; those certain underwriters at Lloyd's, London, signatory to Policies Nos. SL3402 and SLC5421; and Centennial Insurance Company, Defendants.

ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS; the Church of the Immaculate Conception in Columbia Heights, Minnesota; and the Church of the Risen Savior in Apple Valley, Minnesota, Plaintiffs,

v.

UNDERWRITERS AT LLOYD'S LONDON; Interstate Fire & Casualty Company; and Aetna Casualty and Surety Company, Defendants.

Civil Nos. 3–90–441, 3–90–527.

United States District Court,
D. Minnesota,
Third Division.

Jan. 16, 1995.

George F. Restovich, Bruce K. Piotrowski, Restovich Law Office, Rochester, MN, for Diocese of Winona, a Minnesota non-profit religious corporation.

W. Scott Herzog, Peter A. Koller, Charles E. Jones, Moss & Barnett, Mpls, MN, for Interstate Fire and Casualty Company.

John J. McDonald, Meagher & Geer, Mpls, MN, Richard F. Johnson, Hugh C. Griffin, Leslie J. Rosen, Lord Bissell & Brook, Chicago, IL, for Certain Underwriters at Lloyds of London, Signatory to Policies No. SL3402 and SLC 5421, Centennial Insurance.

Andrew J. Eisenzimmer, John C. Gunderson, Meier Kennedy & Quinn, St. Paul, MN, for Archdiocese of Saint Paul and Minneapolis, Church of the Immaculate Conception, in Columbia Heights, Minnesota, Church of the Risen Savior, in Apple Valley, Minnesota.

Paula Weseman Theisen, Faegre & Benson, Mpls, MN, for Aetna Casualty & Surety Company.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

MAGNUSON, Chief Judge.

On June 20, 1994, this Court issued a detailed set of findings of fact and conclusions of law disposing of these consolidated declaratory judgment actions after a paper

trial on the extent of insurance coverage under policies issued by Interstate Fire and Casualty Company ("Interstate"), certain underwriters at Lloyd's of London and the Centennial Insurance Company (collectively "Underwriters"), and Aetna Casualty and Surety Company ("Aetna"). *See Diocese of Winona v. Interstate Fire & Cas. Co., et al.,* 858 F.Supp. 1407 (D.Minn.1994) ("June 20 Order"). The subject of the disputed coverage was indemnification for losses incurred in litigation arising out of the sexual abuse of Thomas Mrozka by Father Thomas Adamson, a priest employed by the Diocese of Winona ("the Diocese") and the Archdiocese of St. Paul ("the Archdiocese") (collectively "the churches"). In a prior state court action, the churches were found liable to Mrozka for $924,750 in compensatory damages, including interest, and for $200,000 in punitive damages. In the June 20 Order, this Court held that coverage existed for the compensatory damages[1] and apportioned those damages among the churches and the various insurers.

Now before the Court are a number of post-trial motions, including: the Diocese' motion for amended and/or supplementary findings; the Archdiocese' motion for amended findings of fact and conclusions of law; the Archdiocese' motion for attorneys' fees, expenses, and costs; Underwriters' supplemental motion to amend; and, Interstate's motion for reconsideration.

The underlying facts are set forth in detail in the June 20 Order, and the Court will not reiterate them here. Except as modified herein by these supplemental findings of fact and conclusions of law, the Court affirms the findings and conclusions of the June 20 Order.

## I. INTERSTATE'S MOTION FOR RECONSIDERATION

Interstate moves the Court for reconsideration of that portion of the June 20 Order relating to the treatment of the self-insured retention ("SIR") provisions of the insuring agreements. This motion is based on a supervening decision of the Minnesota Supreme Court, *Northern States Power Co. v. Fidelity & Cas. Co. of New York,* 523 N.W.2d 657 (Minn.1994) ("*NSP II* ").[2] Because Interstate's argument goes to the heart of the method by which the Mrozka damages were allocated, the Court addresses this motion before turning to the various motions for amendment.

In the June 20 Order, the Court concluded, inter alia, that the churches neither expected nor intended the injuries caused by Father Adamson, that the abuse therefore constituted an "occurrence" as defined in the insurance policies, that all of the policies at issue were triggered except those containing a "sexual abuse" exclusion, and that each church was only liable for a single, weighted SIR for the injuries suffered by Mrozka despite the fact that the abuse continued throughout the coverage of several triggered policies. In addition, the Court set forth an allocation of damages and calculated the liability of each party in light of their prior contributions to an interim funding agreement by which Mrozka was paid following the state court judgment. In ruling that the churches were each responsible for only a single, weighted SIR, the Court relied on the reasonable expectations of the churches and on the Minnesota Supreme Court's decision in *Jostens Inc. v. CNA Ins./Continental Cas. Co.,* 403 N.W.2d 625 (Minn.1987).

*Jostens,* like these cases, involved a continuous injury stretching over a number of policy periods. In *Jostens,* Jostens, Inc. sought indemnification from its excess liability insurer, the CNA Insurance Company, for amounts that Jostens had been required to pay as the result of a settlement of a Title VII sex discrimination class action. 403 N.W.2d at 627. The alleged discrimination occurred during the coverage of two separate insurance agreements between Jostens and

---

1. The Court had previously denied coverage for the award of punitive damages. *See Diocese of Winona v. Interstate Fire & Cas. Co.,* 841 F.Supp. 894 (D.Minn.1992).

2. Interstate originally based its motion on the Minnesota Supreme Court's decision issued on August 24, 1994 and published at 521 N.W.2d 2894179611 (Minn.1994). That opinion was later withdrawn and issued in revised form at 523 N.W.2d 657.

CNA, one of which contained an SIR of $25,000 and the other an SIR of $10,000. *Id.* at 631. After finding liability, the Minnesota Supreme Court addressed the proper amount to be deducted from the total indemnification due to the SIRs. Rather than apportion the class action settlement between the two policy periods and then deduct each SIR, the court deducted only a weighted average of the two SIRs from the total amount of indemnity. *Id.* Applying the same analysis and methodology in the June Order, this Court required each church to assume only a single, weighted SIR for the Mrozka "occurrence" before turning to the insurers for indemnity. Interstate argues that the *NSP II* decision eliminates the force of *Jostens* and requires this Court to revisit and revise its ruling on the number of SIRs for which each church is responsible.

In order to address Interstate's motion, it is necessary to briefly review the interaction between these federal declaratory judgment actions and the Minnesota Supreme Court's efforts to issue a definitive ruling in the *NSP* litigation. This interaction has been turbulent, to say the least. Subsequent to the June 20 Order, the Minnesota Supreme Court issued its first decision in the *NSP* litigation: *Northern States Power Co. v. Fidelity & Cas. Co. of N.Y.*, *withdrawn*, 517 N.W.2d 918 (Minn.1994) ("*NSP I*"). The *NSP* litigation involved coverage under comprehensive general liability ("CGL") insurance policies for a continuous condition that spanned a number of policy periods, specifically, indemnification for the environmental cleanup costs of a contaminated site in Faribault, Minnesota owned by the Northern States Power Company ("NSP"). *See NSP II*, 523 N.W.2d at 658–59. The contamination was the result of coal-tar gasification that had taken place at the site over a period of decades. *Id.*

NSP sought indemnification from several of its CGL insurers, including St. Paul Fire & Marine Insurance Company ("St. Paul"). NSP's insurance policies provided that St. Paul agreed to pay "all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law ... for damages because of injury to or destruction of tangible property." *See Northern States Power Co. v. Fidelity & Cas. Co.*, 504 N.W.2d 240, 243 (Minn.App.1993), *affirmed as modified*, 523 N.W.2d 657 (Minn. 1994). The policies also contained an SIR clause such that "[t]he Insured ... shall pay the first $25,000 for each occurrence or series of occurrences arising out of one event." *Id.* (Some of the policies contained an SIR of $100,000 rather than $25,000. *Id.*)

In *NSP I*, the Minnesota Supreme Court held that the "actual injury" trigger theory applied to the determination of whether a CGL insurer must indemnify. 523 N.W.2d at 662. That is, a CGL insurer must indemnify for actual damages that occurred during the time it was "on the risk". Because actual injury to the contaminated site occurred while the insuring agreements between NSP and St. Paul were "on the risk", the coverage of the agreements was triggered. The Supreme Court recognized, however, that certain injuries, like continuous environmental damage, pose nearly insuperable problems of proof with respect to the allocation of precise amounts of damages to specific policy periods. In such cases, the court suggested, damages should be apportioned evenly across the entire period in which the injury occurred. *Id.* at 664. In fact, the court went as far as to state that where "damages occurred over several policy periods, the trial court should *presume* that the damages were continuous from the point of first damage to the point of discovery or cleanup." *Id.* (emphasis supplied). The Supreme Court deemed this solution to be both practical and consistent with public policy, although not entirely satisfactory from a theoretical perspective. *Id.* at 664. The court further suggested that, in calculating the amount of indemnification, the trial court "should find one 'occurrence' per policy period and should require the insured to pay one deductible [or SIR] per policy." *Id.* at 664. The court did not, however, discuss the relationship of this suggestion to its prior decision in *Jostens*.

Interstate moved this Court for reconsideration of the June 20 Order based on the decision in *NSP I*, arguing that it required the churches to assume a separate SIR for each policy that was triggered. On July 26,

the Court denied Interstate's motion. *See* Memorandum and Order of July 26, 1994 ("July 26 Order"). The Court determined that the *NSP I* court's statements were presented only as "procedural guidelines", noting that the Supreme Court had disavowed that it was establishing a "bright-line" rule. *Id.* at 663. The Court also observed that, if treated as precedent, the dicta in *NSP I* would constitute the implicit overturning of *Jostens. Id.*

The Minnesota Supreme Court subsequently withdrew its opinion in *NSP I* and issued a revised decision. *See Northern States Power Co. v. Fidelity & Cas. Co. of N.Y., withdrawn* 521 N.W.2d 28 (Minn.1994). This decision was also withdrawn and a revised decision issued. *See NSP II, supra.* In *NSP II,* the Minnesota Supreme Court reiterated its suggestion that the continuous environmental contamination at the Faribault site constituted a single occurrence for *each* triggered policy (and that NSP was therefore liable for one SIR for each policy that had been triggered), but raised that suggestion to the level of a holding. *See id.* at 664. ("We hold, therefore, that there has been one occurrence during the policy period of each applicable St. Paul policy and NSP must assume the retained limit with respect to each of these policies.") Most importantly, the Supreme Court recognized that its ruling was "a departure" from *Jostens,* but stated that "[t]o the extent then that [*Jostens*] conflicts with our decision here, it is overruled." *Id.*

▮ This Court concludes that *NSP II* requires its ruling on the number of SIRs assumable by the churches to be revisited and revised. First, these cases are factually indistinguishable from the *NSP* litigation.[3] Each litigation involved indemnification under CGL policies that contained a layer of self-insurance (the SIR) for which the insured was responsible. Each involved injuries incurred over an extended period of time, a period during which the insured was covered by a number of distinct insuring agreements. And, each involved damages that could not rationally be allocated to specific policy periods in which the damages actually occurred.

Second, and most critically, the Minnesota Supreme Court's revision of its opinion in *NSP I* and its explicit overruling of *Jostens* demonstrate that its directions with regard to the treatment of deductibles and SIRs are to be taken as statements of prevailing Minnesota law, not merely as instructive dicta. In the July 26 Order, this Court declined to revise its opinion in light of *NSP I* on the grounds that the Supreme Court's suggestions to the trial court were procedural guidelines, not bright-line rules. In its revised opinion, however, the Minnesota Supreme Court eliminated the language in *NSP I* regarding the difficulty of establishing a principled bright-line rule, stating:

> Like the federal district court in one of the "Agent Orange" cases, we have concluded that the discharge or escape of coal tar and oxide contaminates has been so continuous and repetitive that the unidentifiable individual instances have merged into one continuing occurrence. We hold, therefore, that there has been one occurrence during the policy period of each applicable St. Paul policy and NSP must assume the retained limit with respect to each of these policies.... To the extent that *Jostens, Inc. v. CNA Ins./Continental Cas. Co.,* 403 N.W.2d 625 (Minn.1987) conflicts with our decision here, it is overruled.

*NSP II,* 523 N.W.2d at 664. This strong language elevates that the court's previous "suggestion" respecting the SIRs to the level of a holding, replacing the fact-based approach advocated in *NSP I* with a general rule. The conclusion that the Minnesota Supreme Court intended to establish a general rule regarding the treatment of the SIRs is bolstered by the explicit rejection of *Jostens.* Were the court's ruling that NSP must assume a separate retained limit for each triggered policy merely fact-based, it would have

---

3. There are obvious factual differences between sexual abuse and environmental contamination; none of these differences, however, is relevant to the legal issues posed by this dispute over insurance coverage. This Court has previously recognized the similarity between these cases and the release of hazardous wastes in terms of their consequences for coverage under CGL policies. *See Diocese,* 841 F.Supp. at 898.

been unnecessary for the court to overrule *Jostens*.

The overruling of *Jostens* is of critical importance to the Court's decision to revisit its decision in these cases. As noted earlier, this Court's decision to employ a single, weighted SIR for each of the insured churches was based on the reasonable expectations of the parties and on *Jostens*. Now that *Jostens* has been overruled, at least in this respect, it can no longer provide a basis for this Court's prior ruling on the application of the retained limits.

In addition, the Court holds that the remaining ground for its decision, the reasonable expectations of the parties, is, standing alone, no longer sufficient to justify its previous ruling. Under "reasonable expectations" analysis, " 'the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.' " *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 277 (Minn.1985) (quoting Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L.Rev. 961, 967 (1970)). There is evidence in the record that would support an argument that the churches believed they would not be exposed to liability in excess of a single SIR for any one given loss.

In the June 20 Order, however, this Court did not hold that the churches entertained such beliefs; instead, it held that no party to the agreements could have reasonably believed that multiple SIRs would apply because such a belief conflicted with a common sense interpretation of the CGL policies. *See* 858 F.Supp. at 1422. In *NSP II*, the Minnesota Supreme Court has clearly reached a different conclusion regarding whether or not the possibility of multiple SIRs for a single loss is a reasonable inter-

pretation of CGL policies under these circumstances. The broad statements in the June 20 Order regarding reasonable expectations thus cannot support that order's ruling.[4]

■ Accordingly, the Court revises the June 20 Order to the extent that it holds the churches responsible for a single, weighted SIR. Based on *NSP II*, the Court holds that Father Adamson's abuse constituted a single, continuous occurrence that, with the associated psychological harm to Mrozka, triggered those policies in which an exclusion for sexual abuse did not exist, and that the churches must assume the retained limit with respect to each of the triggered policies. Following resolution of the various motions for amendment, the Court will address the manner in which this ruling affects the allocation of responsibility for the Mrozka compensatory damages.

## II. ATTORNEYS' FEES IN THE UNDERLYING ACTION

■ The Diocese and the Archdiocese both move this Court for an award of their attorneys' fees in defending the Mrozka litigation. The Diocese brings its motion by way of a request for supplemental relief based on Fed.R.Civ.Proc. 54, while the Archdiocese brings its motion in the form of a request for amended findings of fact and conclusions of law under Fed.R.Civ.Proc. 52(b). Both churches argue that their defense costs are part of the "ultimate net loss" they have suffered as a result of the Mrozka claims and that recovery is thus authorized by the CGL policies. The churches also argue that these defense costs are not allocable in the same manner as the compensatory damages, but instead should be deducted directly from the amount the churches are obligated to pay after those damages are allocated.

---

4. Further, the Court declines to resurrect its ruling by finding that the churches had an "objectively reasonable expectation" that only one SIR would apply for any given loss. The churches' arguments on this score were based exclusively on a "common-sense" reading of the CGL policies and on the testimony of several Archdiocesan officials that the insurance agents, Arthur Gallagher & Co., made representations regarding how the insurance plan (including the retained limits) was to operate. As discussed in the text, the "common sense" argument has been rejected by the Minnesota Supreme Court, and the Court finds the remaining testimony too slender a reed on which to base a ruling at odds with *NSP II*.

The motions for attorneys' fees associated with defense of the underlying action are not appropriately addressed to the Court. Neither Rule 54, under which the Diocese brings its motion, nor Rule 52(b), under which the Archdiocese moves, is a proper vehicle for providing additional evidence to the Court regarding the damages suffered by the churches in defending the underlying litigation. Unlike the fees and costs expended by the churches in prosecuting these declaratory judgment actions, the fees associated with the churches' defense of the underlying litigation are, in fact, a component of the costs for which they sought coverage in bringing this action (i.e., "ultimate net loss"), and should, as with any such component of damages, have been presented to the Court as finder of fact at trial.

There appears to be no disagreement among the parties that legal fees expended by an insured may be considered as part of the insured's "ultimate net loss" under the applicable insurance policies. The Underwriters' insuring agreements, for example, defines the "ultimate net loss" covered by the policy as:

[T]he total sum which the Assured becomes obligated to pay by reason of personal injury or property damage claims, either through adjudication or compromise, ... and shall also include ... expenses for doctors, lawyers, nurses, and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Named Assured's permanent employees.

Under this provision, the legal fees expended by the churches appear to be covered as "expenses for ... lawyers" "for litigation ... of claims and suits which are paid as a consequence of any occurrence covered hereunder." Moreover, this indemnity provision does not appear to be tied to any "duty to defend" on the part of the insurer: if the fees are paid as a consequence of any occurrence covered by the policy, the insured is entitled to indemnity for those fees.

The threshold question, however, is not whether recovery for fees is properly authorized by this provision of the insuring agreements; rather, it is why evidence as to the fees expended by the churches in the underlying action is being presented to the Court by way of motion to amend its findings of fact and conclusions of law instead of being presented during trial as part of the coverage sought by the churches. "'[T]he purpose of motions to amend is to correct manifest errors of law or fact or, in some limited circumstances, to present newly discovered evidence.'" *Dale & Selby Superette & Deli v. Dep't of Agriculture,* 838 F.Supp. 1346, 1347 (D.Minn.1993) (quoting *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986)); *see also, Concordia College Corp. v. W.R. Grace & Co.,* 999 F.2d 326, 330 (8th Cir.1993) ("'A motion to alter or amend judgment cannot be used to raise arguments which could have been raised prior to the issuance of judgment.'") (quoting *Hagerman v. Yukon Energy Corp.,* 839 F.2d 407, 413 (8th Cir.), *cert. denied,* 488 U.S. 820, 109 S.Ct. 63, 102 L.Ed.2d 40 (1988)), *cert. denied,* —— U.S. ——, 114 S.Ct. 926, 127 L.Ed.2d 218 (1994). The state court case was tried to a jury in November 1990, and the appeal was completed by May 24, 1992, when the Minnesota Supreme Court denied review. *See Mrozka v. Archdiocese of St. Paul & Mpls., et al.,* 482 N.W.2d 806 (Minn. App.), *review denied* (Minn.1992). Briefs and evidence in the matters before this Court were submitted in the early part of this year. Both churches therefore had ample opportunity to produce evidence and argument regarding their legal expenses in the underlying litigation during trial, but no such evidence or argument was presented.

The problem with the churches' untimely motions for fees is highlighted by considering the insurers' request that discovery regarding the claimed fees be allowed before any specific amounts are awarded. While discovery regarding attorneys' fees is unusual, it would be appropriate where, as here, the fees are not sought after the conclusion of the litigation that generated them, but are, in fact, requested as elements of the damages at issue in the litigation itself. *See, e.g., Public Service Co. of Colorado v. Continental Cas. Co.,* 26 F.3d 1508, 1512 (10th Cir.1994)

(where insured sought attorneys' fees expended in underlying litigation as part of "ultimate net loss" as defined in excess liability policy issued by Lloyd's of London, those fees were the subject of discovery and were presented to the district court as part of plaintiff's trial submissions). Were the Court to award fees based on the Mrozka litigation, the insurers would be deprived of their right to conduct discovery into an element of damages in a case brought against them. The churches should not be able to avoid the usual discovery obligations of a party seeking recovery on an element of damages simply because that element happens to be attorneys' fees.

The churches argue that they were surprised by the Court's decision in the June 20 Order to perform the calculations necessary to apportion specific liability after the legal issues of coverage and allocation were resolved. According to their briefs, the churches "assumed the court would rule on these disputed issues and the parties themselves would do the necessary calculations pursuant to the court's directive," (Archdiocese' Reply Mem. at 7), thereby excusing their failure to present evidence and argument regarding the Mrozka fees during trial. The short answer to this contention is that record provides no justification whatsoever for the churches' assumption.[5] To the contrary, the record strongly suggests that the churches reached an independent conclusion that the issue of the Mrozka fees should be resolved after trial on the coverage issues, and for that reason declined to introduce evidence and argument regarding those fees. This type of unilateral decision-making is hardly the basis for excusing the deliberate

failure of a party to introduce evidence regarding damages.

Moreover, even if the churches' belief about the procedures that were to be followed were legitimate, it does not explain or justify these motions. First, the churches' contention explains no more than the failure to provide evidence of the *amounts* of fees. If the churches expected the Court to resolve only the legal issues regarding allocation and coverage, it would still have been necessary to present the Court with argument regarding *coverage* for the Mrozka fees. No such argument was presented. Second, the June 20 Order does not prevent the parties from resolving the fees issue outside of this litigation. According to the churches, they anticipated that the Court's decision on the legal issues of coverage and allocation would allow the parties to themselves make the necessary calculations regarding fees, but were forced to bring these motions because the June 20 Order prevented them from doing so. Nothing in the June 20 Order prohibited the parties from addressing the fees themselves; hence, the churches' argument that the order forced them to bring these motions is unavailing and does not explain the necessity of these motions to amend.[6]

## III. LITIGATION FEES IN THESE DECLARATORY JUDGMENT ACTIONS

The churches also seek recovery for the litigation expenses they have incurred in these declaratory judgment actions. The Diocese seeks these fees under provisions of the insuring agreements and under Minn. Stat. § 555.08, while the Archdiocese relies solely on the insuring agreements. The

---

**5.** At least, if such support exists, the churches have failed to identify it. Moreover, statements by the churches themselves demonstrate their awareness that coverage for the Mrozka defense costs were part of the damages they sought. (*See, e.g.,* Diocese' Mem. in Support of Mot. for Supp. Relief at 13 (the Diocese brought this action "to establish its contractual rights to both indemnification for the Mrozka loss and for reasonable defense costs"); Archdiocese Reply Mem. at 3 (refuting Interstate's argument that *the action by the Archdiocese concerned* "only the issue of allocation of coverage" by noting that the action as brought contains "a claim

against Lloyd's and Interstate for breach of contract", including attorneys' fees and costs)).

**6.** Finally, the churches argue that they could not have been expected to provide evidence regarding the Mrozka fees because, in some insurance disputes, the declaratory judgment action concerning coverage is heard prior to the completion of the underlying litigation. In this respect, it is enough to note that this is not such a case; the underlying litigation was completed prior to the trial of these matters. In the case that the churches describe, a motion to amend based on new evidence might indeed be appropriate.

churches make a number of arguments in support of their motions; although, as will become clear, only one of the grounds pressed by the churches is necessary to the Court's decision, the issues raised are sufficiently complex that discussion of the alternative grounds suggested provides considerable clarification.

### 1. The *Morrison* Exception

■ In Minnesota, "[t]he general rule is that attorney fees are allowed only when authorized by statute or provided for in the contract." *Independent School Dist. No. 697, Eveleth v. St. Paul Fire & Marine Ins. Co.*, 515 N.W.2d 576, 581 (Minn.1994) (citing *Lanoue v. Fireman's Fund American Ins. Cos.*, 278 N.W.2d 49, 54 (Minn.1979)). The Minnesota Supreme Court has "recognized a limited exception to this general rule and has allowed attorneys fees in a declaratory action by an insured to establish the insurer's contractual duty to defend and indemnify." *Id.* (citing *Lanoue*, 278 N.W.2d at 54; *Morrison v. Swenson*, 274 Minn. 127, 142 N.W.2d 640 (1966)). The churches first argue that this exception to the general rule, known as the *Morrison* exception, justifies an award of attorneys' fees because the insurers breached their obligation to indemnify the churches. In response, the insurers contend that the *Morrison* exception is limited to cases in which an insurer breaches a "duty to defend", and does not extend to mere breaches of a duty to indemnify.

The Court is persuaded that the insurers' reading of the *Morrison* exception more accurately reflects the state of the law in Minnesota. In its most recent complete discussion of the exception, the Minnesota Supreme Court held that: "[W]e decline to extend the award to cover attorney fees beyond the typical *Morrison*-type exception, i.e., *fees incurred as a direct loss incident to the breach of a contractual duty to defend.*" *Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 714 (Minn.1991) (emphasis supplied); *see also, Sazama Excavating, Inc. v. Wau-*

*sau Ins. Cos.*, 521 N.W.2d 379, 383 (Minn. App.) (citing *Garrick*), *review denied* (Minn. 1994). Unless the churches can establish a breach of a contractual duty to defend, therefore, the *Morrison* exception does not allow an award of attorneys' fees.

■ The Archdiocese' agreement with Aetna contains a duty to defend on the part of Aetna. The Archdiocese does not argue that Aetna breached this agreement; indeed, it is undisputed that Aetna did in fact provide defense to the Archdiocese. Thus, the fees expended by the Archdiocese in this litigation cannot be recovered from Aetna under the *Morrison* exception.

The churches do not argue that their insuring agreements with Interstate and Underwriters contain provisions regarding a duty to defend; [7] instead, they argue that the agreements contain a duty to indemnify, that Interstate and Underwriters breached this duty, and that the *Morrison* exception, by analogy, justifies an award of attorneys' fees for that breach just as it would for a breach of the duty to defend. The churches point out, correctly, that the Minnesota Supreme Court has stated the rationale for the *Morrison* exception in extremely broad terms. *See, e.g., Security Mut. Cas. Co. v. Luthi*, 303 Minn. 161, 226 N.W.2d 878, 885 (1975) ("To deny an insured the legal fees incurred in establishing coverage would work a substantial hardship in many instances. The insured would be compelled to bear litigation costs in situations where he contracted in order to avoid just such an expense.") The churches' arguments based on the dicta in *Luthi* have considerable force, as well as equitable appeal. Requiring an insured to pay the legal costs of enforcing a contractual right to indemnity does, to some extent, deprive the insured of the benefit of the bargain they believed to have obtained in executing the insuring agreement in the first place. This inequity, however, is no greater than the inequity that generally results when one party to a contract must pursue litigation to

---

**7.** The churches do cite frequently to Minnesota Supreme Court case law discussing the scope of the duty to defend in insurance policies that contain such provisions. The Court does not interpret this citation as an argument that a contractual duty to defend on the part of Underwriters and Interstate did exist; to the extent that the churches intended such an argument, the Court finds it extremely unpersuasive.

enforce its contractual rights. Any time that a party must resort to litigation to obtain the benefits of its bargain, the value of that bargain is correspondingly reduced. Were the *Morrison* exception extended in the manner that the dicta in *Luthi* suggests, attorneys' fees would be awarded in every successful action for breach of an insurance contract. The Court declines to adopt such a radical revision of the general rule in Minnesota that attorneys' fees will only be awarded as authorized by statute or provided for by contract.

■ Consistent with the holding in *Garrick,* the Court holds that the *Morrison* exception does not apply where, as here, an insured is not attempting to enforce a contractual duty to defend but is instead seeking only to enforce coverage.

### 2. Fees Expended "At the Request" of the Insurer

■ The Archdiocese also relies on the Minnesota Supreme Court's decision in *Atlantic Mut. Ins. Co. v. The Judd Co.,* 380 N.W.2d 122 (Minn.1986), to justify its request for litigation expenses from Aetna.

In that case, as in *Luthi, supra,* the Supreme Court held that an insured could obtain attorneys' fees for the successful defense of a declaratory judgment action, based on a provision in the insuring agreement that provided that the insurer would reimburse the insured for expenses incurred at the insurer's request. *See The Judd Co.,* 380 N.W.2d at 126 (insurer will pay "reasonable expenses incurred by the insured at the company's request in assisting the company in the investigation of any claim or suit"); *see also, Luthi,* 226 N.W.2d at 881 (insured will "pay all expenses incurred by the Company for investigation, adjustment, and defense, and reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request"). The Aetna insuring agreement with the Archdiocese provided that Aetna would pay "reasonable expenses incurred by the insured at the company's request in as-

sisting the company in the investigation or defense of any claim or suit." Supplementary Payments, Section (d) ("SP(d)"). This language is essentially identical to the policy in *The Judd Co.*[8]

Aetna argues that the result in *The Judd Co.* does not obtain here because this declaratory judgment action, unlike the actions in both *Luthi* and *The Judd Co.,* was brought by the churches rather than by the insurers. The Court agrees that Aetna's distinction is relevant to the narrow question of whether or not the specific provision at issue here requires the payment of attorneys' fees. Under the rationale of *The Judd Co.,* attorneys' fees are available to an insured because defense of a declaratory judgment suit is action undertaken "at the company's request." *See* 380 N.W.2d at 126. In order to find for the Archdiocese on this issue, the Court would have to deem *prosecution* of a declaratory judgment action as expenses "undertaken at the company's request"; in other words, that Aetna "requested" this declaratory judgment action simply by offering defense of the Archdiocese under a reservation of rights. The language of provisions like SP(d) has already been stretched near the breaking point by decisions like *The Judd Co.* and *Luthi,* and the Court declines to extend it further in the manner suggested by the Archdiocese.

### 3. Litigation Expenses as "Ultimate Net Loss"

■ Finally, the churches argue that their litigation expenses incurred in these declaratory judgment actions are recoverable under the basic coverage of the insuring agreements. As described earlier, the "ultimate net loss" covered by the Underwriters' insuring agreements includes "all sums paid as salaries, wages, compensation, fees, charges and law costs" and "expenses for ... lawyers ..., and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder." The churches contend that expenses in this actions are covered

---

8. This theory of recovery has no application to the churches' requests for attorneys' fees from Underwriters and Interstate because the insuring agreements executed by those insurers do not contain provisions like SP(d).

under this provision, as losses that are, in effect, a "consequence" of the occurrence.

Underwriters and Interstate do not respond directly to this argument. Instead, their briefing of the substantive fees issues is dedicated to refuting the applicability of the *Morrison* exception and describing the limited characteristics of the rule applied by the Minnesota Supreme Court in *The Judd Co.* The insurers have apparently failed to recognize that analysis of the insuring agreements does not necessarily end with the review of this case law. Recovery for litigation expenses on the basis of a contractual provision is not limited to the unique contracts of *Morrison* and *The Judd Co.* If a contract adequately provides for the award of litigation expenses, those expenses should be awarded, even if no court has yet ruled on the applicability of the contract language in question.

The question is thus whether the costs of these declaratory judgment actions were "paid as a consequence" of the occurrence of Father Adamson's abuse. The Court holds that expenses expended in a declaratory judgment action against an insurer who denies coverage are properly treated as consequential expenses arising out of a covered occurrence for the purposes of the defining "ultimate net loss". As the Minnesota Supreme Court has repeatedly stated, the preferred method in Minnesota for resolving a dispute over coverage is an action for declaratory judgment. *See, e.g., Jostens, Inc. v. Mission Ins. Co.,* 387 N.W.2d 161, 167 (Minn. 1986); *Grain Dealers Mut. Ins. Co. v. Cady,* 318 N.W.2d 247, 249 n. 3 (Minn.1982). An insurer that denies coverage and/or defense must reasonably expect that a declaratory judgment action is a likely result. It is thus a reasonably foreseeable consequence of the occurrence itself.

The conclusion that the language of the insuring agreements covers litigation expenses is bolstered by the policy concerns expressed by the Minnesota Supreme Court in *Luthi, supra.* Where an insured specifically contracts with an insurer to indemnify the insured as to the legal expenses associated with a covered occurrence, it is appropriate to include the legal expenses of enforcing coverage within the scope of indemnification just as it is appropriate to include the legal expenses of any other litigation relating to the occurrence itself. Otherwise, "[t]he insured would be compelled to bear litigation costs in situations where he contracted in order to avoid just such an expense." *Luthi,* 226 N.W.2d at 885.

■ There is no doubt that Underwriters denied coverage for the abuse of Mrozka. Beginning in May of 1990 (before this litigation was brought), and continuing throughout, Underwriters have denied that any coverage was available for the Mrozka damages because Father Adamson's actions were neither "unexpected or unintended". Interstate has denied coverage for the same reason. While Interstate's pre-litigation correspondence with the churches is less direct than that of Underwriters regarding the denial of coverage, Interstate's conduct of this litigation has made its intent to deny coverage crystal-clear, thereby rendering the question as to whether it had in fact denied coverage prior to the litigation moot. There is furthermore no doubt that the churches have established coverage, at least for the compensatory portion of the award to Mrozka. While the decision in *NSP II* and the application of multiple SIRs substantially limit the *amount* of indemnification available to the churches, as demonstrated below, the question of *coverage* for the compensatory damages in the Mrozka litigation has definitely been decided in their favor.

■ The Court's holding that the churches are entitled to their litigation expenses for these declaratory judgment actions vis-a-vis Underwriters and Interstate raises the question of allocation of those expenses. Underwriters and Interstate argue that the litigation expenses should be allocated in the same manner as the compensatory damages. The Court agrees. The churches are entitled to their litigation expenses because those expenses are part of the "ultimate net loss" suffered as a result of the Mrozka "occurrence." As such, the expenses are subject to the same treatment as any other covered losses, including the compensatory damages. The litigation expenses will therefore be allocated among the relevant

policy periods according to the method set forth in the June 20 Order, subject to the modifications set forth in these supplemental findings and conclusions.

 In awarding litigation expenses, the Court also makes three exclusions. First, the amount of litigation expenses allocated to the policy period for which Aetna is responsible will not be added to the allocated amount of the compensatory damages because the contract-based theory of recovery on which the Court is awarding expenses does not apply to Aetna. Second, the insurers will not be liable for the expenses allocated to the policy periods in which the "sexual abuse" exclusion was in force. And third, the Court will proportionately reduce the amount of expenses awarded in accord with the ratio between the compensatory and punitive damages. The contract only allows for legal expenses associated with claims and suits arising out of a covered occurrence. This language cannot extend to support an award of expenses incurred in pursuit of claims that were ultimately determined not to be covered. *Cf. State Farm Fire & Cas. Co. v. Williams*, 355 N.W.2d 421 (Minn.1984) (no litigation expenses recoverable by insured in unsuccessful defense of declaratory judgment action). While a proportionate reduction in fees is a rather crude method of approximating the amounts expended on the punitive damages claim, the disputes over the two claims were sufficiently intertwined that no other reasonable alternatives present themselves, nor have the parties suggested one. The amount of reduction is 18% ($200,000/$1,124,750).

## IV. WHO PAYS AND HOW MUCH

Pursuant to the Court's holdings on the treatment of the SIRs, the following charts set forth the amounts of the Mrozka compensatory damages allocated to each policy period, the applicable SIR, the applicable policy amount, and the entity responsible for that amount.

### ARCHDIOCESE

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 1 | $51,422.71 | $10,000 | $3,000,000 | ---- |
| | | Arch. | Aetna | |
| 2 | 56,097.48 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 3 | 56,097.48 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 4 | 56,097.48 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 5 | 56,097.48 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 6 | 56,097.48 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 7 | 56,097.48 | 100,000 | 100,000 | ---- |
| | | Arch. | Underwriters | Arch. |

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 8 | 28,048.74 | ---- | ---- | ---- |
| | | Arch. | Arch. | Arch. |

## DIOCESE

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 1 | $51,422.66 | $75,000 | $125,000 | $5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 2 | 68,563.59 | 75,000 | 125,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 3 | 68,563.59 | 75,000 | 125,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 4 | 68,563.59 | 75,000 | 125,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 5 | 68,563.59 | 100,000 | 100,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 6 | 68,563.59 | 100,000 | 100,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 7 | 68,563.59 | 100,000 | 100,000 | ---- |
| | | Diocese | Underwriters | Diocese |
| 8 | 45,709.06 | 100,000 | ---- | ---- |
| | | Diocese | Diocese | Diocese |

---

Thus, the parties are liable for the Mrozka compensatory judgment in the following amounts, rounding to the nearest dollar:

| | |
|---|---|
| Archdiocese | $374,634 |
| Diocese | 508,513 |
| Aetna | 41,423 |
| Total: | $924,570 |

 In order to properly assign prejudgment interest for these amounts, it is necessary to address the allocation of liability in light of the contributions to the interim funding agreement *before* turning to the allocation of the litigation expenses. Each insurer contributed more to the pool than the amount of its ultimate liability; each is therefore entitled to recovery of the additional amounts plus prejudgment interest pursuant to Minn.Stat. § 549.09. The sum that each of the churches owe, after their contributions to the pool are deducted, will be divided among the insurers according to the percentage of the entire amount still owing to the insurers. These calculations are set out in the following table: [9]

9. Due to rounding, the amounts owed by the churches to the pool do not correspond exactly

| | Settlement Contribution | Liability | Refund or (Payment) | Division of Payment | |
|---|---|---|---|---|---|
| Archdiocese | $103,884 | $374,634 | ($270,750) | Aetna: | $29,846 |
| | | | | U'writers: | 44,430 |
| | | | | Interstate: | 196,474 |
| Diocese | ---- | 508,513 | (508,513) | Aetna: | $56,056 |
| | | | | U'writers: | 83,446 |
| | | | | Interstate: | 369,011 |
| Aetna | 127,258 | 41,423 | 85,835 | | |
| Underwriters | 127,778 | 0 | 127,778 | | |
| Interstate | 565,650 | 0 | 565,050 | | |

As Aetna made its payment to the pool on December 16, 1991, it is owed prejudgment interest under Minn.Stat. § 549.09 from that date through the date judgment is entered. Interstate is similarly owed interest from January 6, 1992, the day it made its contribution through the date judgment is entered, and Underwriters are owed prejudgment interest from January 29, 1992.

The next issue is whether any additional payments are necessary due to the litigation expenses awarded for these declaratory judgment actions. In order to make this determination, the expenses claimed by the churches must be assessed, allocated among the policy periods, and then added to the existing allocated losses to determine whether the total losses exceed the SIR for any given period, and, if so, by how much.

 The amount of litigation expenses claimed by the Diocese for the prosecution of this declaratory judgment is $78,204.44. The insurers have not challenged the hours expended by the Diocese in pursuit of this action, nor have they challenged the hourly rates asserted by the Diocese for its attorneys. Based on its experience with market rates in the locality for representation of this quality in this type of complex litigation, the Court finds that the hourly rates of $100.00 to $125.00 for George Restovich, $60.00 to $75.00 for Bruce Piotrowski, and $45.00 per hour for the service of Diane Klingfus, a paralegal, are reasonable. Pursuant to its ruling above, the amount claimed is reduced by 18% to $64,127.64.

The amount of litigation expenses claimed by the Archdiocese for the prosecution of this declaratory judgment action is $85,909.28. The insurers have not challenged the hours expended by the Archdiocese in pursuit of this action, nor have they challenged the hourly rates asserted by the Archdiocese for its attorneys. Underwriters do argue that the billing invoices submitted by the Archdiocese are inadequate in that they do not specify the hourly charge for the attorneys working on the case for the Archdiocese. The invoices submitted by the Archdiocese are substantially less detailed than appropriate for a motion for expenses of this magnitude; however, they are not so defective as to justify denying the Archdiocese' motion. It is possible, on the basis of the invoices sub-

to the amounts to which each insurer is entitled. The judgment will be based on the amounts owed by the churches.

mitted, to determine that the hourly rates charged the Archdiocese for the services of Andrew Eisenzimmer and John Gunderson varied between $110 and $140. Based on its experience with market rates in the locality for representation of this quality in this type of complex litigation, the Court finds these hourly rates to be reasonable. The amount claimed is reduced by 18% to $70,445.61.

Allocating the amounts of legal expenses over the policy periods and excluding the amounts noted earlier, the following charts set forth the loss covered (the Mrozka compensatory damages plus the allocable litigation expenses), the applicable SIR, the applicable policy amounts, and the entity responsible for each amount.

## ARCHDIOCESE

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 1 | $60,129.47 | $10,000 | $3,000,000 | ---- |
| | | Arch. | Aetna | |
| 2 | 65,595.76 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 3 | 65,595.76 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 4 | 65,595.76 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 5 | 65,595.76 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 6 | 65,595.76 | 100,000 | 100,000 | 5,000,000 |
| | | Arch. | Underwriters | Inter. |
| 7 | 65,595.76 | 100,000 | 100,000 | ---- |
| | | Arch. | Underwriters | Arch. |
| 8 | 28,048.74 | ---- | ---- | ---- |
| | | Arch. | Arch. | Arch. |

## DIOCESE

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 1 | $57,907.48 | $75,000 | $125,000 | $5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 2 | 77,210.01 | 75,000 | 125,000 | 5,000.000 |
| | | Diocese | Underwriters | Inter. |

| Policy Period | Damages | SIR | First Layer | Second Layer |
|---|---|---|---|---|
| 3 | 77,210.01 | 75,000 | 125,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 4 | 77,210.01 | 75,000 | 125,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 5 | 77,210.01 | 100,000 | 100,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 6 | 77,210.01 | 100,000 | 100,000 | 5,000,000 |
| | | Diocese | Underwriters | Inter. |
| 7 | 77,210.01 | 100,000 | 100,000 | ---- |
| | | Diocese | Underwriters | Diocese |
| 8 | 45,709.06 | ---- | ---- | ---- |
| | | Diocese | Diocese | Diocese |

The Archdiocese is thus entitled to an additional payment of $8,706.76 ($60,129.47 - $51,422.71) from Aetna in coverage of its litigation expenses, and the Diocese is entitled to a payment of $6,630.03 (3 * ($77,210.01 - $75,000)) from Underwriters in coverage of its litigation expenses. Neither church is entitled to any payment from Interstate because none of the allocated damages exceeds the sum of the SIR and the intermediate layer of coverage provided by Underwriters.

## V. UNDERWRITERS' MOTION TO AMEND

The small award to Diocese requires the Court to address Underwriters' motion to amend under Rule 52(b), or in the alternative, to correct a mistake in the judgment under Rules 60(a) and 60(b). Underwriters point out that the first level of coverage beyond the SIR was not provided by a single entity, but rather was provided in three distinct arrangements. The bulk of the coverage was provided by underwriters at Lloyd's of London, a sizeable portion was provided by Centennial Insurance Company ("Centennial"), and the remaining coverage was provided by a number of London-based insurance companies. Underwriters asks the Court to amend the June 20 Order to specify the allocation of liability among the various insurance entities.

The Court will not assign liability to parties who have not appeared. The Answers submitted in response to the Diocese' Complaint indicate that only the underwriters at Lloyd's, led by Alan Godfrey Lee, and Centennial have appeared, both represented by the Chicago office of Lord, Bissell & Brook and the Minneapolis firm of Meagher, Geer. While the Complaints specify that recovery was sought against the other insurance companies (Diocese' Complaint, ¶ 7), the Answers of Lee's groups and Centennial do not admit representation of those entities. (*See* Answer of Centennial Insurance Company, ¶¶ 7–9; Answer of Alan Godfrey Lee, ¶¶ 7–9.)

The Court's review of the record indicates that Lee's groups were responsible for 75.920% of the coverage in period two, 73.304% of the coverage in period three, and 73.616% of the coverage in period four. (Periods two, three, and four are the periods in which the covered losses by the Diocese exceeded the SIR for the respective period.)

Lee and his underwriters are therefore obligated to pay the Diocese $4,924.79. Centennial was responsible for 10% of the coverage in period two, 20% in period three, and 20% in period four. Centennial is therefore obligated to pay the Diocese $1,005.01. The remaining insurance companies, representing the a small percentage of the coverage, are not obligated to reimburse the Diocese because they were not a part of this litigation.[10]

## VI. CONCLUSION

It is perhaps unfortunate that this insurance dispute has reached such a relatively anticlimactic denouncement. It is without a doubt unfortunate that the parties (and this Court) expended so much time and energy addressing and resolving coverage issues that were ultimately rendered moot by a supervening decision of the Minnesota Supreme Court. That court, nevertheless, has the appropriate authority to decide and set forth the law of the State of Minnesota, and this Court is bound to apply that law in circumstances such as these.

ACCORDINGLY, THE COURT VACATES THE JUDGMENT ENTERED ON THE BASIS OF ITS ORDER OF JUNE 20, AND ORDERS THAT:

1) Interstate Fire and Casualty Company's Motion for Reconsideration (Clerk's Doc. No. 109 in Civ. No. 3–90–527) is GRANTED;

2) The Diocese of Winona's Motion for Supplementary Relief (Clerk's Doc. No. 88 in Civ. No. 3–90–441) is GRANTED IN PART and DENIED IN PART as set forth in the above supplemental findings of fact and conclusions of law;

3) The Archdiocese of St. Paul and Minneapolis' Motion for Amended Findings of Fact and Conclusions of Law (Clerk's Doc. No. 82 in Civ. No. 3–90–527) is DENIED;

4) The Archdiocese of St. Paul and Minneapolis' Motion for Attorneys Fees, for Expenses and Costs (Clerk's Doc. No. 83 in Civ. No. 3–90–527) is GRANTED IN PART as set forth in the above supplemental findings of fact and conclusions of law;

5) The motion of Certain Underwriters at Lloyd's of London and Centennial Insurance Company's Supplemental to amend (Clerk's Doc. No. 104 in Civ. No. 3–90–441) is GRANTED IN PART as set forth in the above supplemental findings of fact and conclusions of law;

6) The parties are liable in the following amounts for the compensatory damage award in *Mrozka:*

| | |
|---|---|
| Archdiocese of Saint Paul and Minneapolis | $374,634 |
| Diocese of Winona | 508,513 |
| Aetna Casualty and Surety Company | 41,423 |
| Certain Underwriters at Lloyd's, London and Centennial Insurance Company | 0 |
| Interstate Fire and Casualty Company | 0; |

7) Aetna Casualty and Surety Company is entitled to judgment, along with additional interest as allowed under Minn.Stat. § 549.09 from December 16, 1991 through the date judgment is entered in this matter, in the following amounts against the following parties:

| | |
|---|---|
| Archdiocese of Saint Paul and Minneapolis | $29,846 |
| Diocese of Winona | 56,056; |

8) Certain Underwriters at Lloyd's, London, represented by Alan Godfrey Lee, and the Centennial Insurance Company are entitled to judgment, along with additional interest as allowed under Minn.Stat. § 549.09 from January 29, 1992 through the date judgment is entered in this matter, in the following amounts against the following parties:

| | |
|---|---|
| Archdiocese of Saint Paul and Minneapolis | $43,340 |
| Diocese of Winona | 83,446; |

9) Interstate Fire and Casualty Company is entitled to judgment, along with additional interest as allowed under Minn.Stat. § 549.09 from January 6, 1992 through the date judgment is entered in this matter, in the following amounts against the following parties:

---

10. It would appear that these companies, by failing to answer the complaints, may be in default, but the Court expresses no view on how such a procedural irregularity should be resolved, if at all, between the relevant companies and the churches.

Archdiocese of Saint Paul
and Minneapolis $196,474
Diocese of Winona 369,011;

10) The Diocese of Winona is entitled to judgment against the certain underwriters at Lloyd's of London represented by Alan Godfrey Lee in the amount of $4,924.79. The Diocese of Winona is also entitled to judgment against the Centennial Insurance Company in the amount of $1,005.01; and,

11) The Archdiocese of St. Paul and Minneapolis is entitled to judgment against Aetna Casualty and Surety Company in the amount of $8,706.76.

Let judgment be entered accordingly.